UNITED STATES of America,
Appellant,

v.

DIXON, John P., Appellee.

No. 80–2289.

United States Court of Appeals,
Third Circuit.

Argued April 23, 1981.

Decided Aug. 27, 1981.

As Amended Sept. 22, 1981.

Rehearing and Rehearing In Banc
Denied Oct. 5, 1981.

---

**6.** K. Llewellyn, The Bramble Bush 66–67 (1960).

Frank H. Sherman, Asst. U. S. Atty. (argued), Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Philadelphia, Pa., for appellant.

James C. Schwartzman (argued), Schwartzman & Hepps, Philadelphia, Pa., for appellee.

Before HUNTER and SLOVITER, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

The key issue in this case is whether there is sufficient evidence to support the conviction of appellee, John ("Jack") Dixon, for aiding and abetting the bribery of Stephen B. Elko, Administrative Assistant to United States Representative Daniel J. Flood. 18 U.S.C. §§ 2, 201(b)(2) (1976). The district court granted a post-verdict motion acquitting appellee because it believed there was insufficient evidence to support the jury's verdict. After studying the record, we come to a different conclusion. We will, therefore, reverse the lower court's judgment and reinstate the verdict against appellee.

## FACTS

In October, 1979, appellee, Jack Dixon, was charged with seventeen counts of mail fraud, 18 U.S.C. § 1341 (1976), one count of bribery, 18 U.S.C. § 201(b)(2), and with aiding and abetting both the seventeen counts of mail fraud and the bribery violations, 18 U.S.C. § 2. He was tried with co-defendants, George L. Guerra and E. Wharton Shober, for his alleged participation in a scheme to pay Congressional Aide Stephen B. Elko for his efforts to secure a profitable hospital construction contract for companies in which appellee held an interest.

The evidence at trial revealed the following scheme: In August, 1971, Hahnemann

---

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

Medical College and Hospital of Philadelphia ("Hahnemann") sought financing for the construction of additions to and renovations of its facilities. This project, known as the "Tower Project", was led by the new President of Hahnemann, E. Wharton Shober. In 1974, Hahnemann sought federal financial assistance for its project. Shober contacted the office of United States Congressman Daniel J. Flood and the hospital filed a grant application for $11,450,000. During this time, and until June, 1976, Stephen B. Elko served as Administrative Assistant to Congressman Flood; Congressman Flood was a member of the Appropriations Committee and Chairman of the Appropriations Subcommittee for Labor, Health, Education and Welfare and Related Agencies.[1]

In order to "inspire his imagination" and insure the interest and assistance of Congressman Flood in Hahnemann's efforts to obtain federal funding, Elko suggested that Shober gather together a $10,000 campaign contribution for Flood. Appendix at 464A. Shober delivered approximately $8,500 to Elko between April, 1974 and November, 1974. After some legislative jostling, Hahnemann received its funds.

Elko's interest in the Hahnemann project was inspired, however, by more than the $10,000 contribution to Congressman Flood's campaign. During July and August of 1974, Elko also arranged, in return for a substantial fee, for his friends to secure work on the Tower project. He contacted Shober and told him that he had some companies that he wanted Hahnemann to consider employing for its project.[2] One of these companies was Environmental Design Center, Inc. ("EDCI")—an architectural and engineering business formed by Jack Dixon, his attorney, Richard Fox, and his associate, Richard Spang.[3]

In mid-July, 1974, Elko met with Jack Dixon, and Dixon's brother, Ed, at Jack's home in Frackville, Pennsylvania. Elko told the Dixons at that time about the Hahnemann Project and said that he and Congressman Flood could arrange to get EDCI involved in the project. Elko wanted to know what the Dixons could do for both him and the Congressman. Specifically, they discussed the split of engineering fees. The parties agreed to the following arrangement: the Dixons would together take four percent of any proceeds received by EDCI from Hahnemann; Elko would take another four percent. Elko told the Dixons that he would set up an appointment for the company's representative, Spang, with Shober at the hospital.[4]

In July, 1974, Spang met with Jack Dixon at his home. Dixon informed Spang that

---

1. As chairman of the Appropriations Subcommittee on Health, Education and Welfare Congressman Flood had considerable power over the appropriations of his subcommittee. As his aide Elko testified:

    [T]he chairman of a subcommittee in the Appropriations Committee has virtual life and death authority over the flow of money to the . . . federal agencies, and he is it. He has got the gavel, as they say in the trade. He has got absolute control over that money, and he can start and stop the flow of funds to the agencies that he is responsible for at virtually his own discretion.

    Appendix at 453A.

2. One month after Shober submitted Hahnemann's grant application, Elko contacted Shober and said:

    I am going to have some people call you and make an appointment with you . . . it is an engineering firm, and the Congressman is very interested in it, and he would appreciate your giving them a lot of attention and what-

ever you can do to assist them in developing work with the hospital.

Appendix at 471A. Later that month, Jack Dixon and Richard Spang met with Shober. Appendix at 477A.

3. Although Spang owned all of the stock of EDCI, Jack Dixon agreed to loan up to $100,000 to the company in return for 80% of EDCI's profits. The loan agreement was evidenced by a document signed on July 12, 1974 between EDCI, Spang and his wife, and the Gentom Trust, a trust set up by Jack Dixon. In total, appellee Dixon ended up lending EDCI $51,200 through the Gentom Trust. Appendix at 784A–91A; 806A.

4. It was shortly after this meeting that Elko contacted Shober and told him that he would be receiving a call from representatives of EDCI and that they were "very good friends of the Congressman, and [they should] do all they could to assist them. . . ." Appendix at 476A.

there was a possibility that EDCI could get work at Hahnemann through Elko in Congressman Flood's office. Appendix at 814A. Shortly thereafter, Jack Dixon and Richard Spang met with Shober at the hospital.[5] After several conversations, EDCI submitted a proposal to the Hospital for a contract fee in excess of $1,000,000.

Later that month, in August, 1974, Elko met with Jack and Ed Dixon to discuss EDCI's contract price. Appellee reported to Elko that the Hospital wanted to cut down the price of the contract and complained that EDCI could not do the job for less money. Elko responded that the initial contract was to get their "foot in the door" and additional money could be earned from change orders or supplemental contracts in the future.

Heeding Elko's advice, Jack Dixon told EDCI's representative, Spang, that the Hospital could only go along with a contract fee in the range of $500,000; Spang submitted another proposal to the Hospital for this lower amount in September, 1974. Hahnemann, however, never formally agreed to this offer and by March of 1975, EDCI still did not have a contract with Hahnemann.

By this time, EDCI was falling into severe financial difficulties. Spang, therefore, contacted George Guerra (appellee's co-defendant at trial) to discuss the possibility of having Guerra's company, Capital Investment Development Corporation ("CIDC"), assume EDCI's negotiations with the Hospital. Spang explained to Guerra his relationship with Jack Dixon and Dixon's arrangements with Stephen Elko. Guerra agreed to have Spang run CIDC, while Spang continued to maintain his ownership interest in the essentially inactive EDCI.[6]

As soon as Spang entered into this business arrangement with Guerra, he reported to Jack Dixon what had occurred. Within days of his discussion with Guerra, Spang met with Jack Dixon and Dixon's attorney, Richard Fox, at appellee's home. At that time, Dixon told Spang that when CIDC received a contract at Hahnemann certain payments would have to be made from the proceeds of the contract. Those payments, as related by Jack Dixon to Spang in early April, 1975, were as follows: 9.6% would be applied to pay off a bank loan; Jack and Ed Dixon would split equally 5% of the contract payments and Elko would receive 3% of the contract payments. The payments to the Dixons, Fox and Elko would continue for the life of CIDC's contract with the Hospital.

Spang reported to Guerra the breakdown of payments demanded by the appellee. Although Guerra thought that the amounts of the required payments were quite high, he accepted the arrangement.

Thus, by the second week of April, 1975, Elko was aware that CIDC, not EDCI should receive the contract from Hahnemann. At Jack Dixon's request, Elko arranged with Shober to meet with Guerra at the hospital. Elko telephoned Shober and told him that friends of Congressman Flood from an architectural and engineering firm named CIDC would be contacting him for an interview.

On April 23, 1975, Spang and Guerra met with Shober and Spang explained his working relationship with CIDC and Guerra. It was agreed that CIDC would submit a proposal to Hahnemann for services to the Hospital. After reviewing the unexecuted contract submitted by EDCI to the Hospital, Guerra submitted a CIDC proposal to Hahnemann. The parties went through six

---

5. Shober first met for a few minutes with appellee alone; he then called Spang in to discuss the details of the arrangements. Even before this meeting, Jack Dixon had told Spang that Hahnemann already had a construction management firm under contract on the Tower Project. It was not known, however, what services this management firm would perform. Appendix at 813A–18A.

6. Guerra was the sole shareholder of CIDC. Jack Dixon did not have a loan agreement with the company, although he did have an agreement to receive 2.5% of the firm's contract payments. Appendix at 846A–47A.

months of negotiations. During this period, Jack Dixon put pressure continually on Elko "to put the hammer on Shober." Appendix at 877A. At one point, Elko reminded Shober that CIDC was "the annointed pigeon" and that arrangements should be worked out for the company to get the contract. Guerra also made it clear to the Hospital that CIDC would not even bill Hahnemann unless the Hospital received its $14.5 million government grant.

Finally, on December 8, 1975, the Hahnemann Board of Trustees approved the hiring of CIDC as project monitor on the Tower Project for a fee of $835,000. Just three weeks earlier, Community Services Administration, an agency over which Congressman Flood's Appropriations Subcommittee had control, approved the release of $2.5 million of the grant program to Hahnemann. It was at that time, on November 15, 1975, that Elko received his first payment pursuant to his agreement with Jack and Ed Dixon. Appendix at 594A. Ed Dixon delivered $1,500 in cash to Elko at Ed Dixon's home in Gilberton, Pennsylvania. Ed Dixon made a second payment in January, 1976.

In the Spring of 1976, Hahnemann amended its agreement with CIDC. The amendment resulted in CIDC receiving reduced payments for its March and April services, with full payment being contingent upon the successful completion of the Tower project. The attorney who prepared the amendment, Robert Tuteur, informed Elko of the revised CIDC payment schedule. Soon thereafter, Elko met with the appellee and his brother, asking "Where is my money that we agreed to?" Appendix at 592A. Appellee then met with Fox, Guerra and Spang to discuss the manner in which the remaining payments would be made. It was agreed that all arrangements would remain the same—five percent to the Dixons and three percent to Elko—and all payments would be funneled from Guerra through Fox for distribution.

In total, eight payments were delivered by Ed Dixon to Elko. They ended in July, 1978, shortly after Elko was indicted for an offense unrelated to the Hahnemann agreement.

## PROCEDURAL HISTORY

Appellee was indicted, with co-defendants Guerra and Shober, in October, 1978. Guerra and Dixon, were charged with offenses relating to the kickback scheme to secure EDCI and CIDC contracts with the hospital. Shober was charged with bribing Elko and Flood to secure Hahnemann's federal grant for the Towers project. Count 18 of the Indictment, *reprinted in* Appendix at 50A. Guerra and Dixon were charged with offenses relating to the scheme to secure the engineering firms' contracts with Hahnemann. Counts 1 through 17 & 19 of the Indictment, *reprinted in* Appendix at 39A–51A. Although the Government acknowledged that the charge against Shober was a "different" bribery offense than that with which defendants Dixon and Guerra had been charged in Count 19, it introduced at trial, over defendants' objections, evidence relating to this count. The court permitted the introduction of this evidence after the Government promised that it could "tie up" the information into an overall, unified scheme involving all of the defendants.

The Government failed to fulfill its promise. After the Government concluded its case, the trial judge granted Shober's motion for acquittal. It subsequently granted all three defendants' motions for acquittal on remaining mail fraud counts. The trial court refused, however, to grant Guerra and Dixon's motions for acquittal on Count 19, the Elko-CIDC bribery charge.

The jury returned a verdict of guilty against both Dixon and Guerra on Count 19 of the indictment. Defendants each filed Motions for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and, in the alternative, a new trial, Fed.R.Crim.P. 33. The district court granted appellee's motion for post-verdict acquittal because it found that there was insufficient evidence "to allow the jury to speculate that John Dixon had aided and abetted in or was otherwise responsible for the future payments of money to Stephen Elko."

Appendix at 24A. · The court, although disturbed by the possibility of prosecutorial misconduct,[7] did not grant appellee's motion for a new trial because it found that the issue had been mooted by its ruling on the Rule 29(c) motion. The court expressly stated, however, that absent this ruling it would have granted appellee's motion for a new trial.[8]

The Government appeals from the district court's judgment on Dixon's motion for acquittal.

## DISCUSSION

### A. JURISDICTION

■ It is by now well-established that the Government may appeal, under 18 U.S.C. § 3731 (1976), a post-verdict judgment of acquittal. *United States v. Uzzolino*, 651 F.2d 207 at 212 (3d Cir. 1981); *United States v. Schoenhut*, 576 F.2d 1010 (3d Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978). *See also United States v. Jenkins*, 420 U.S. 358, 365, 95 S.Ct. 1006, 1011, 43 L.Ed.2d 250 (1975); *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). The only exception to this rule—one incorporated into the statute itself—is "that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." 18 U.S.C. § 3731.[9] *See United States v. DiFrancesco*, 449 U.S. 117, 128–30, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980); *United States v. Scott*, 437 U.S. 82, 85, 98 S.Ct. 2187, 2191, 57 L.Ed.2d 65 (1977); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568, 97 S.Ct. 1349, 1353, 51 L.Ed.2d 642 (1977); *Uzzoliro*, at 212; *Schoenhut*, 576 F.2d at 1018 n.7. Appellee contends that the appeal in this case violates the double jeopardy clause because: (1) appellee is likely to receive a new trial if the verdict is reinstated; and (2) it violates double jeopardy · for an appeals court to reassess the sufficiency of the evidence once a court or jury has held in favor of the defendant.

■ Appellee's arguments are without merit. First, although the trial court stated that it believed that appellee would be entitled to a new trial if he had not been granted his motion for a post-verdict acquittal,[10] the Supreme Court has held repeatedly that "the double jeopardy guarantee 'imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside' (emphasis in original)." *DiFrancesco*, 449 U.S. at 131, 101 S.Ct. at 434, *quoting North Carolina v. Pearce*, 395 U.S. 711, 720, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656 (1969). If appellee is retried following our reinstatement of the verdict, it will be the result of his own motion for a new trial, and not a process imposed upon him by the Government or this court. Accordingly, any subsequent retrial will not violate appellee's guarantee against double jeopardy. *Scott*, 437 U.S. at 91, 98 S.Ct. at 2194.

■ Appellee's second argument is equally unconvincing. While it is true that "the Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence." *DiFrancesco*, 449 U.S. at 131, 101 S.Ct. at 434, *citing Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978),[11] this rule does not bar a Government appeal following a trial court's holding that there is

---

7. Appendix at 31A–33A. *See* note 21 & accompanying text *infra*.

8. Trial Court's bench opinion at 23, *reprinted in* Appendix at 31A ("I want to state for the record that if a judgment of acquittal under Rule 29 were not entered. I would, indeed, grant the defendant Dixon a new trial.").

9. Section 3731 provides:
In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

10. *See* note 8 *supra*.

11. *See also Hudson v. Louisiana*, 450 U.S. 40, 42, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981); *Scott*, 437 U.S. at 92–101, 98 S.Ct. at 2194–99.

insufficient evidence to support a jury's verdict. *Uzzolino*, at 212 n.6; *United States v. Steed*, 646 F.2d 136, 138 (4th Cir. 1981); *United States v. Blasco*, 581 F.2d 681, 682–84 (7th Cir.) *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *United States v. Cahalane*, 560 F.2d 601, 603 n.2 (3d Cir. 1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. De Garces*, 518 F.2d 1156, 1159 (2d Cir. 1975). An appeal, unlike a new trial, does not give the Government a "second crack" at proving its case against the defendant. *See DiFrancesco*, 449 U.S. at 131, 101 S.Ct. at 434. In determining the sufficiency of the evidence, this court, as was the trial court, is limited to a review of the record. If we find that the trial court erred in its judgment, no new trial will be required.[12]

■ Accordingly, we hold that our review of the district court's judgment does not violate the fifth amendment's double jeopardy prohibition and there is, therefore, jurisdiction for this appeal under 18 U.S.C. § 3731.

## B. SUFFICIENCY OF THE EVIDENCE

■ In reviewing the district court's post-verdict judgment of acquittal, we must determine whether the evidence, when viewed in a light most favorable to the government, supports the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Beck*, 615 F.2d 441, 447–48 (7th

Cir. 1980). *Accord, Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. United States Gypsum Co.*, 600 F.2d 414, 416–17 (3d Cir.) *cert. denied*, 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). In applying the *Glasser* and Fed.R.Crim.P. 29(a) standards to our review of a post-verdict judgment of acquittal rendered on the ground of insufficiency of the evidence, we recognize that we are at variance with *United States v. Steed, supra*. There, the Fourth Circuit, while acknowledging that a government appeal will lie under 18 U.S.C. § 3731 (1976) from a post-verdict judgment of acquittal, rendered that right effectively nugatory by according absolute deference to the trial court's assessment of the sufficiency of the evidence. The Fourth Circuit sought to avoid the anomaly inherent in the fact that if the trial court enters a judgment of acquittal prior to verdict, no government appeal will lie. While we understand this concern, we do not believe that this anomaly can be avoided. The statute, 18 U.S.C. § 3731 (1976), gives the government a right of appeal except where such appeal would contravene the double jeopardy clause. The Fourth Circuit rule of absolute deference takes away what the statute grants. Because that grant is plainly constitutional, as the *Steed* decision recognizes, we conclude that it is not within the judicial province to abrogate it.[13]

Appellee was convicted of one count of aiding and abetting the bribery of Stephen

---

12. As a recent commentator stated "[t]he double jeopardy clause protects the defendant only from appearing before a second trier of fact, not from undergoing appellate proceedings." Comment, *Double Jeopardy and Appeal of Dismissals" A Before-and-After Approach*, 69 Calif.L.Rev. 863, 869 (1981). Appellee contends that when the sufficiency of the evidence is at issue, the appellate court sits as a second trier of fact, not in appellate review of legal errors. *See United States v. Burroughs*, 564 F.2d 1111, 1118 (4th Cir. 1977) (dictum). This argument can be rejected on two grounds. First, the question of the sufficiency of the evidence, although "factual" in nature, is conceptually one of law. *Steed*, 646 F.2d at 142 n.12. Second, the Supreme Court has never held that the fact-law distinction applies when the Government appeals a post-verdict acquittal. Rather,

courts continue to hold that such judgments are appealable because no retrial of the defendant is required. *See, e. g., Blasco*, 581 F.2d at 683–84.

13. Our decision to apply *Glasser* and Fed.R. Crim.P. 29(a) standards to review of post-verdict judgments of acquittal, where they are based on a trial court's view that the proofs were insufficient to sustain a guilty verdict, is in accord with decisions in other circuits. *See, e. g., United States v. Brandon*, 633 F.2d 773, 780 (9th Cir. 1980); *United States v. Beck*, 615 F.2d 441, 447–448 (7th Cir. 1980); *United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979). *See also United States v. Donahue*, 539 F.2d 1131, 1135 (8th Cir. 1976).

Elko. 18 U.S.C. §§ 2, 201(b)(2).[14] Under section 201(b)(2):

> Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity with intent-
>
> (2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States;

18 U.S.C. § 201(b)(2).[15]

▉ In order to aid and abet this offense a defendant must do more than associate with individuals involved in the criminal venture.

[He must] participate in [the criminal enterprise] as something he wishes to bring about and that he seeks by his action to make it succeed ... Mere presence at the scene of a crime, even in the company of one or more of the principal wrongdoers, does not alone make one an "aider and abettor," unless the jury is convinced beyond a reasonable doubt that [the] defendant [did] something to forward the crime and that he was a participant rather than merely a knowing spectator.

*United States v. Rosa*, 404 F.Supp. 602, 617 (W.D.Pa.1975), *aff'd*, 560 F.2d 149 (3d Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977), (citations omitted). *See Beck*, 615 F.2d at 448–49; *United States v. Hopkins*, 354 F.Supp. 634, 637 (D.C.Pa. 1973).[16] The district court, after reviewing the evidence and noting inconsistencies and ambiguities in two witnesses' testimony, concluded that there was insufficient evidence to prove beyond a reasonable doubt that appellee had wished to and helped bribe Stephen Elko. We come to a different conclusion. Not only do we believe that there is sufficient evidence that the crime of bribery occurred, we also find that the evidence supports the jury's verdict that appellee aided and abetted that crime.[17]

---

**14.** Section 2 of Title 18 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**15.** Appellee does not dispute on appeal that Stephen Elko, as Congressman Flood's Administrative Assistant, was a "public official" within the meaning of the statute. 18 U.S.C. § 201(a). Rather, he asserts that the trial court did not err in holding that there was insufficient evidence to prove that appellee aided and abetted in the commission of the three crucial elements of a § 201(b) violation: (1) directly or indirectly giving, offering or promising the money; (2) doing such acts willfully and corruptly; and (3) doing such acts with an intent to influence Elko's actions with regard to the Hahnemann Tower project. *See* Appendix at 1952.8A.

**16.** *See also Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978).

**17.** In order to convict a defendant of aiding and abetting the commission of a crime, the Government must prove two essential elements: (1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting that crime knew of the commission of the substantive offense and acted with the intent to facilitate it. *United States v. Byrne*, 422 F.Supp. 147, 158 (E.D.Pa.1976), *aff'd in part, vacated in part, sub. nom. United States v. Cahalane*, 560 F.2d 601 (3d Cir. 1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. Williams*, 391 F.Supp. 741, 742–43 (E.D.Pa.1975). Appellee suggests that he may not be convicted of aiding and abetting the bribery because his co-defendant was subsequently acquitted of the substantive offense. Although this information is not part of the record before us, we note that the Supreme Court has held that a defendant accused of aiding and abetting in the commission of a federal offense may properly be convicted despite the acquittal of the alleged perpetrator of the offense. *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). As the Court stated in *Standefer*: "With the enactment of [section 2], all participants in conduct violating a federal criminal statute are 'principals.' As such, they are punishable for their criminal conduct; the fate of

A brief review of the record reveals the following testimony implicating appellant in the scheme to bribe Stephen Elko. Elko testified that in mid-July, 1974 he first met with Jack Dixon.

STEPHEN ELKO: I described the hospital project to Jackie and Ed Dixon and what was involved, it was a large scale project. And I said I could help them get the business and be instrumental in it, that the Congressman and I could do this, and I wanted to know from them what they could do for me and the Congressman, and we discussed specifically splits of engineering fees.

And in this discussion we—between the Dixons and myself, we had agreed that they would take care of their side of the business and I—they didn't want to know details—I would take care of my side, and we agreed that we would split eight percent.

BY MR. SCHENCK;

Q. What do you mean? Eight percent of what?

A. Of any contract that the engineering business would produce.

Appendix at 475A. Thus, by mid-summer, 1974 Jack Dixon not only knew of the scheme to bribe Elko, but he also agreed to the plan's terms and gave his assurance that he would take care of his "side of the business."

Jack Dixon's participation in the plan is further evidenced by his contact with Elko in the early fall of 1974. Elko asked appellee to serve as a troubleshooter and arrange for a company that could successfully secure a contract with Hahnemann.

STEPHEN ELKO: I told—in August-September of '74 I told both Ed and Jack Dixon that they are going to have to come up with an outfit, an engineering firm, that had some real substance, with good engineers, and—to get involved in this project.

Appendix at 503A. Jack Dixon was told that it was important for him to find a company that could secure a "foot in the door" and become a source for the payoffs. Appendix at 510A. See also Appendix at 506A; 555A.

Elko also testified that Jack Dixon arranged for Elko to support CIDC. Although Jack Dixon did not hold the same financial interest in CIDC as he did in EDCI,[18] Elko testified that CIDC was considered to be "Dixon's people" (Appendix at 552A) and Dixon asked Elko to take care of the "annointed pigeon" (Appendix at 562A).

By Mr. Schenk: Without going into the area that—of things you discussed with Ed Dixon, what were your discussions with Jack Dixon in April of 1975, as best you can recall?

Stephen Elko: In April of '75, I had discussions with Jack Dixon about an engineering contract with Hahnemann.

Q. And do you recall what those conversations were, or what you said to him or he said to you at that time?

A. Well, at this time he asked me to make an appointment for a Mr. Guerra with Mr. Shober, or to make arrangements for him to make an appointment, and I said I would.

Q. Do you know who Mr. Guerra was?

A. It was a name to me. He was the head of an engineering firm.

Q. Do you know what firm?

A. CIDC.

Appendix at 535A–36A.

Not only did appellee know of CIDC's successorship interest in EDCI's negotiations with Hahnemann (Appendix at 567A), but Richard Spang testified that it was Jack Dixon who presented to CIDC Elko's terms for helping it with Hahnemann.

By Mr. Sherman: Who said it to you?

Richard Spang: Jack Dixon.

Q. And what did he say?

A. He told me that—gave me the breakdown of the money that had to be had for the—for his help on the Gentom—Gentom Trust note and for

other participants is irrelevant." *Id.* at 20, 100 S.Ct. at 2006.

**18.** *See* note 6 *supra.*

other commissions that he required for the contract.

Q. Which contract?

A. Hahnemann Hospital contract.

Q. And again, as best you can recall, what did Mr. Dixon say the breakdown was?

Mr. Schwartzman: Can we get a date on this alleged conversation?

By Mr. Sherman:

Q. Do you recall approximately when it was?

A. Early part of April, 1975, is the best I can recall.

Q. And what did Mr. Dixon tell you the breakdown was?

A. Two and a half percent for Jack Dixon, two and a half percent for Ed Dixon, three percent for Steve Elko, and two percent for Richard Fox, which is really a payment for his legal services; and 9.6 percent to repay the Gentom Trust note.

Appendix at 849A–50A.

Thus, even from these brief excerpts, we find that the record supports a finding that Jack Dixon both knew of and actively supported the bribing of Stephen Elko. His efforts as a middleman were crucial in CIDC's arrangements with Elko. While Jack Dixon never delivered the actual payoffs to Elko (Appendix at 670A), he knew of them (Appendix at 592A) and stood to gain from Elko's use of his influence as Congressman Flood's Assistant.

The district court granted appellee's motion for a post-verdict acquittal because it believed that there was insufficient reliable testimony upon which to convict him. In particular, the court stated that (1) there was no evidence to show that appellant physically transferred the payments to Elko; (2) the testimony that was offered to implicate appellant was ambiguous and, at times, inconsistent; and (3) even if the evidence demonstrated that appellant knew of the plans and was present at conversations in which it was formulated, it did not show that appellant's participation reached the level of "aiding and abetting" the bribery. Appendix 16A–30A. We disagree.

First, it is of no consequence that appellee was not involved in the actual payment of the bribes. Section 201(b)(2) requires only that something of value be offered or promised, not that a bribe be paid. 18 U.S.C. § 201(b)(2) ("Whoever, directly or indirectly, corruptly gives, offers *or* promises anything of value ... shall be fined ... or imprisoned...."); *United States v. Kemmel*, 188 F.Supp. 736 (D.C.Pa. 1960), *aff'd*, 295 F.2d 712 (3d Cir. 1961), *cert. denied*, 368 U.S. 988, 82 S.Ct. 604, 7 L.Ed.2d 525 (1962). Furthermore, appellee was convicted only of aiding and abetting the violation of section 201(b)(2). It has long been established that a defendant charged with aiding and abetting the bribery need not be present at the time of the delivery. *Daniels v. United States*, 17 F.2d 339, 345 (9th Cir.) *cert. denied*, 274 U.S. 744, 47 S.Ct. 591, 71 L.Ed. 1325 (1927). By definition, "[a]n accessory before the fact is one who was not present actually or constructively at the time when a felony was committed, but who counseled, procured or commanded another to commit it, and he is equally guilty with the principal." *Id.*

The district court's second reason for finding that the evidence was insufficient was based on its belief that the testimony offered to associate appellant with the formulation of the bribery plans was ambiguous and inconsistent. The district judge, relying on his trial notes, focused on ambiguities in the testimony of two key witnesses—Stephen Elko and Richard Spang. The first ambiguity noted by the court was Elko's imprecise recollection of his 1974 summer meeting with appellee. At times Elko referred to a "summer" meeting with the Dixons; at other times he referred to the "July, 1974" meeting. Elko also recounted the content of his discussions with the Dixons without singling out those remarks that were made specifically to or by Jack Dixon.

When considered in its entirety and with the aid of a transcript of the trial, Elko's testimony establishes unequivocally Jack Dixon's involvement in the EDCI plan. In

the summer of 1974, Jack Dixon met with Elko at Dixon's home in Frackville, Pennsylvania and agreed to the payment schedule for Elko's support of EDCI. Appendix at 475A. Then, in August of that year, Dixon confirmed these plans and discussed with Elko EDCI's difficulties in securing a contract with Hahnemann. Appendix at 503A. Although the district court's notes may have been correct in suggesting that at points in the trial Elko's testimony was unclear as to whether his conversations were with Jack or Ed Dixon,[19] by the trial's end Elko had testified unmistakenly to Jack Dixon's involvement in the plan to support EDCI. Appendix at 507A, 510A, 535–36A, 567A.

The district court also believed that there was an ambiguity in a second witness' testimony against the appellee in that Richard Spang never specified that Jack Dixon, rather than his brother Ed, was involved in the plan to bribe Elko for his support of CIDC. Yet, as shown by the testimony quoted *supra* at ¶ 31, once pressed to recount his specific conversations with Jack Dixon only, Spang testified that the appellant was intimately involved in CIDC's arrangements with Stephen Elko. Appendix at 872A, 875A, 876A, 877A, 994A. Because it is neither this court's nor the district court's role to evaluate the credibility of the witnesses, Fed.R.Crim.P. 29(c), we find that both Elko and Spang's testimony supported the jury's verdict against the appellant.

The district court's third and final reason for granting appellant's Rule 29(c) motion was its belief that even if the evidence demonstrated that appellant was present at the meetings with Elko, it did not establish that Jack Dixon participated in the scheme in such a way as to make himself an "aider

and abettor" of the crime. In the district judge's opinion, "There [was] nothing in [the] testimony to indicate participation by Dixon ... as one who seeks to bring about the result; he did not follow through as one who seeks to make the proposition succeed, ...." Appendix at 23A. While the district court properly characterized the standard for "aiding and abetting a crime,"[20] we believe that it misconceived appellee's role in the bribery scheme.

Jack Dixon was not merely a passive observer of the illegal arrangements with Elko. He played a critical role in their establishment. The record shows that Elko did not know either Spang or Guerra. He had no reason to recommend EDCI or CIDC to Hahnemann other than one common denominator—Jack Dixon. And, Dixon had every reason to secure the arrangements with Elko. He had a direct financial interest in EDCI and had been promised a percentage of the contract price if CIDC received the contract from Hahnemann.

The record indicates that Jack Dixon took positive steps to safeguard his investments. These steps, however, were illegal. He met with and arranged for the bribery of a Congressional Aide. It was Jack Dixon who received the initial contact from Elko. And, when Elko could no longer support EDCI, it was Jack Dixon who relayed to Spang that new arrangements must be made. Thus, while appellee was not actively involved in the payment stage of the bribery scheme, it does appear, when viewing the evidence in a light most favorable to the Government, that the jury was justified in finding beyond a reasonable doubt that appellee aided and abetted the bribery of Stephen Elko and Congressman Flood.

**19.** Elko testified repeatedly that he met with both Ed and Jack Dixon and that he did not know for certain whether specific remarks were made to the appellee. Appendix at 504A, 555A, 618A. However, when pressed to clarify appellee's involvement in the conversations, Elko explained that both Dixons were present at the conversations, Appendix at 503A, 507A–08A, 555A, and that he recalled specific remarks to and by Jack Dixon. *See, e. g.*, Appendix at 510A.

**20.** *See United States v. Cowart*, 595 F.2d 1023, 1031 (5th Cir. 1979); *United States v. Baumgarten*, 517 F.2d 1020, 1027 (8th Cir.), *cert. denied*, 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975); *United States v. McMahon*, 562 F.2d 1192, 1195 (10th Cir. 1977); *United States v. Hathaway*, 534 F.2d 386, 399 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

## C. NEW TRIAL

■ While the record, as it appears before us, supports the jury's verdict, the district court suggested that the record may have been seriously tainted by improper lines of questioning at trial.[21] Federal Rule of Criminal Procedure 33 provides that "The court on motion of a defendant may grant a new trial to him if required in the interest of justice." The rule may be applied where there is finding of prosecutorial misconduct, see, e. g., Luttrell v. United States, 320 F.2d 462 (5th Cir. 1963), as well as when the trial court does not believe that the evidence supports the jury's verdict, United States v. Robinson, 71 F.Supp. 9, 11 (D.D.C.1947).[22]

■ In the instant case, the district court stated that the circumstances of appellee's case warranted a new trial, but the issue had become moot by its grant of the post-verdict acquittal. The issue is no longer moot. The effect of our judgment is to reinstate the jury's verdict. Because the appellee filed a timely motion for a new trial,[23] the district court may now decide on remand whether to grant appellee's motion.

## CONCLUSION

We, therefore, reverse the lower court's judgment and remand for further proceedings in accordance with this opinion.

---

21. In its bench opinion, the district court detailed the errors it believed tainted appellee's trial:

> [T]he jury heard the testimony of various witnesses presented throughout the case whose testimony was primarily directed against the defendant Shober. I refer, for example, to the testimony of Douglas McArthur, Thomas Rollis, Jack Ramsey, Isadore Brodsky, Lawrence Corson, Robert Tuteur, and John Marsh. This testimony was admitted primarily because of Shober's involvement, although as part of the entire so-called scheme, but as against the defendant Dixon and the specific charges against him would, I believe, be prejudicial and justify a new trial.
>
> Secondly, certain testimony was from time to time offered against only one of the three defendants, or in some instances against two of the three defendants. This varied from time to time and from witness to witness, so that the jury repeatedly heard testimony not applicable to all the defendants.
>
> Considering the multiple-count indictment involved and the multiple defendants involved, the best of limiting or cautionary instructions was inadequate, and in some instances was not even attempted, lest we pile or heap confusion upon confusion.
>
> Thirdly, hearsay testimony was repeatedly admitted on the Government's assurance that a conspiracy or scheme involving all three defendants would be ultimately established. In the opinion of the court it was not, thus further allowing the jury to consider improper, inadmissible, and, therefore, prejudicial evidence.
>
> Fourthly, repeated objections were made by counsel for one defendant or another, and that is an understatement on the basis of this record. These statements, proper on behalf of the client, were necessarily sometimes most confusing to a jury considering the case against all three defendants. This was the result, again, of multiple-count indictment involving multiple defendants, and further prejudiced the defendant, denying him under the circumstances a fair trial.

Appendix at 31A–33A.

22. In fact, in situations in which the court is not certain that the evidence does not support the verdict, a new trial may be the preferred remedy over a post-verdict acquittal. "In directing a judgment of acquittal, the Court makes a final disposition of the case. On the other hand, in setting the verdict aside the Court merely grants a new trial and submits the issues for determination by another jury." Robinson, 71 F.Supp. at 11 (emphasis added).

23. Fed.R.Crim.P. 33 directs that "A motion for a new trial ... shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period." Appellee's motion was made orally on July 9, 1980 and in writing on July 11, 1980, following his conviction on July 8, 1980.