**UNITED STATES of America**

v.

**Stefan A. BRODIE, Donald B. Brodie, James E. Sabzali, Bro–Tech Corporation d/b/a "The Purolite Company"**

**No. CRIM.A.00–629.**

United States District Court, E.D. Pennsylvania.

June 13, 2003.

Joseph G. Poluka, U.S. Attorney's Office, Philadelphia, PA, for plaintiff.

Gregory B. Craig, Williams and Connolly, Washington, DC, for defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

The Court decides here the motions of Don Brodie, James Sabzali, and Bro–Tech Corporation ("the three defendants") for a judgment of acquittal made at the close of the government's case and the motions of all of the defendants for a new trial.[1] The

1. The Court granted the motion of Stefan Brodie for a judgment of acquittal on May 31, 2002.

defendants were convicted by a jury of conspiracy to violate the Trading With the Enemy Act ("TWEA") and the Cuban Assets Control Regulations ("CACRs"). The three defendants were also convicted of substantive violations of TWEA and the CACRs. The alleged conspiracy involved sales of ion exchange resins to Cuba through intermediaries.

The Court will deny the motions of the three defendants for a judgment of acquittal but will grant the motions for a new trial because of the cumulative effect of the improper and inflammatory arguments made by the prosecutors to the jury during closing arguments.

### I. *Overview*

In its decision on Stefan Brodie's motion for judgment of acquittal, the Court gave an overview of the alleged conspiracy and described the sales made by Bro–Tech to Cuba through intermediaries. The Court will not repeat that discussion here and incorporates it by reference herein.

There was no dispute by the defendants that the sales to Cuba took place. The issue was whether the defendants knowingly and willfully violated the TWEA and the CACRs. The primary defense was that Stefan Brodie, the chief executive officer of Bro–Tech, consulted with attorneys at various times during the alleged conspiracy and informed Bro–Tech's sales force that any sales to Cuba had to be shipped from the United Kingdom.

The three defendants were charged with conspiracy (Count 1) and 75 substantive violations of the TWEA and the CACRs. Counts 2–7, 10–17, 19–29, 31–35, and 37–41 charge sales to Cuba from 1994 to 1996. Counts 43–45, 47–51, 53–60, 64–65, 67, 69–70, 74–75, and 77 charge sales to Cuba from 1997 to 1999. Counts 8, 9, 18, 30, 36, 46, 52, 61–63, 66, 68, 71–73, and 76, charge authorization or reimbursement of ex-

penses associated with Cuban travel. The verdict was as follows:

- Don Brodie and Bro–Tech guilty, and James Sabzali not guilty, of Counts 2–7, 10–17, and 19–28, and Don Brodie, James Sabzali, and Bro–Tech guilty of Counts 29, 31–35, and 40, which relate to 1994–1996 sales;

- Don Brodie, James Sabzali, and Bro–Tech not guilty of Counts 37–39, and 41, which relate to four sales in 1996;

- Don Brodie, James Sabzali, and Bro–Tech not guilty of Counts 43–45, 47–51, 53–60, 64–65, 67, 69–70, 74–75, and 77, which relate to 1997–1999 sales;

- Don Brodie, James Sabzali, and Bro–Tech not guilty of Counts 8, 9, and 18, which relate to expenses through February 1995;

- Don Brodie, James Sabzali, and Bro–Tech guilty of Counts 30 and 36, which relate to expenses from June to September 1995, and from January 1996; and

- James Sabzali and Bro–Tech guilty, and Don Brodie not guilty, of Counts 46, 52, 61–63, 66, 68, 71–73, and 76, which relate to expenses from April 1997 to April 1999.

### II. *Motions for Judgment of Acquittal*

The Court incorporates by reference herein the discussion of the legal principles applicable to a motion for judgment of acquittal that are set forth in its earlier decision on Stefan Brodie's motion. The Court applies those same principles to the three defendants' motions for a judgment of acquittal.

 The guilty verdict against Bro–Tech is derivative of the verdicts against Don Brodie and James Sabzali. If the motions with respect to those two individual defendants are denied, Bro–Tech's motion must also be denied. The Court has reviewed the evidence carefully, studied

the three defendants' motions carefully, and held oral argument on the motions. The Court is convinced that there is sufficient evidence to uphold the jury verdict against the three defendants on all counts of which they have been convicted.

The Court will not detail the evidence here or discuss all the defendants' arguments. The Court, however, will discuss one argument that Mr. Sabzali's counsel stressed at oral argument. The strongest evidence that the government introduced to show that Mr. Sabzali knew about the law with respect to the Cuban embargo was a memorandum, introduced as Government Exhibit 11 and dated April 7, 1993, from Stefan Brodie to all sales offices and other individuals, including Don Brodie. The letter referred to a sale to Cuba through an intermediary that came to his attention during the 1992 audit. The critical part of the letter stated:

> While it is proper to ship this order from the UK in terms of UK law, it is contrary to USA policy and law to ship material of any kind to the island nation of Cuba in violation of the U.S. embargo. Brotech Corporation is a U.S. Corporate citizen, and as such, has no intention of violating U.S. policy, now nor in the future.

> No shipment of Purolite merchandise is to be shipped to, redirected to, or transshipped to Cuba. Any requests to do so are to be reported to Don or me.

Gov't Ex. 11.

At trial, it was the government's theory that this memorandum was a sham to cover up the alleged conspiracy. The government put on the stand a salesman located in the Southwest who testified that he never received the memorandum. The implication was that it did not go out as indicated. Mr. Sabzali's counsel argued that the government was estopped from relying on this letter to show that Mr.

Sabzali knew that it was illegal to ship from the United States to Cuba because the government argued at trial that it did not go out to the sales offices and there was no other evidence that Mr. Sabzali had knowledge of the law.

The government disputes the characterization of its argument at trial and argues that there was other evidence of Mr. Sabzali's knowing and willful conduct. Even if the memorandum was the only evidence of Mr. Sabzali's knowledge of the law, it is enough to sustain the verdict. The jury was the fact finder here. The jury was entitled to make whatever findings it wanted as long as there was evidence to support those findings. The jury may have rejected the government's argument that the memorandum was not sent to the sales offices, and concluded that it was sent to Mr. Sabzali in Canada.

### III. *Motions for a New Trial*

■ The defendants have moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. Rule 33 authorizes the Court to grant a new trial if required in the interest of justice. "The rule may be applied where there is a finding of prosecutorial misconduct as well as when the trial court does not believe that the evidence supports the jury's verdict." *United States v. Dixon,* 658 F.2d 181, 193 (3d Cir.1981) (internal citations omitted).

■ The defendants argue that prosecutorial misconduct during closing arguments requires a new trial. Improper argument by a prosecutor violates the Constitution if it renders a trial so fundamentally unfair as to deny a defendant due process. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The Court should look to three factors to evaluate whether the misconduct caused prejudice: (i) the

scope of the comments in the context of the trial; (ii) the effect of curative instructions; and (iii) the strength of the evidence. *United States v. Mastrangelo,* 172 F.3d 288, 297 (3d Cir.1999).

■ The jury verdict will not be disturbed if it is highly probable that the prosecutorial misconduct did not contribute to the judgment. *See Government of Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir.1976). The Court will evaluate each alleged instance of prosecutorial misconduct separately and then consider the comments as a whole in deciding whether it is highly probable that the alleged misconduct did not contribute to the judgment.

### A. Statements Relating to Document Destruction

■ During his opening statement, the prosecutor stated that, "you'll hear testimony from an entry clerk who recalls that at about that time—she's not sure when—some of the invoices typed on the Bala Cynwyd paper were ripped up." Tr. at 31. The order entry clerk, Joan Graves, did not testify that any invoices had been ripped up. Nor did any other witness testify that documents had been ripped up

or otherwise destroyed. During his closing argument, the prosecutor stated:

Well, the first thing that happens is Joan Graves tells you what happens, she remembers that there were several more orders already in the hopper for San Marco, in fact *she told you the exact number, she said there were three orders.* What does she say she did with them? *She tore them up.* She didn't say, well, we just wrote cancelled on it, it's not a big deal—if I could see that cancelled order back in Galax—she didn't say that, *they tore them up and trashed them, they trashed the orders* because now Agent McCrossan and Customs, they're asking questions.

Tr. at 2017 (emphasis added).[2]

Ms. Graves testimony on this issue was that she recalls "other orders from Bro-Tech in Bala Cynwyd to San Marco that were going to be shipped out of Philadelphia," that those orders were cancelled, and that she doesn't know why the orders were cancelled. Tr. at 659. She did not testify as to the "exact number" or that "there were three orders" or that anyone "tore them up and trashed them," as the prosecutor stated to the jury.[3] Tr. at 2017.

**2.** The defendants also complained that the prosecutor asked questions of Joan Graves that were designed to suggest that documents had been destroyed or withheld, although he lacked a proper basis to make these suggestions. For example, during questioning about Government Exhibits 112–134, he asked "[w]ere there any documents that were not included in those packets that should be in those packets?" Ms. Graves replied, "It looks like everything is there that should be." Tr. at 632. Later, Ms. Graves testified that the Canadian office would have correspondence related to its purchase orders. The prosecutor then established that such correspondence did not appear among certain exhibits related to Canadian purchase orders and asked Ms. Graves "Do you know where those documents are?" Tr. at 641–43. The Court sus-

tained an objection to this question for lack of foundation. The defendants argue that these questions demonstrate that the prosecutor repeatedly tried to suggest to the jury that documents were missing or had been destroyed. The prosecutor did appear to be suggesting document destruction or concealment without a proper foundation. But because the Court sustained one objection and Ms. Graves answered the other question in a way that benefitted the defendants, the Court does not rely on this conduct in granting the new trial.

**3.** The defendants made the point during the trial and in their motions for a new trial that there is no indication that Ms. Graves ever stated before trial that documents had been destroyed. The Report of Investigation and numerous pages of investigator's notes cover-

The defendants objected to these statements after the closing and moved for a mistrial. The Court denied the motion. The government conceded at the trial and concedes in its opposition to the motions that these statements were not supported by the evidence and were improper.

The Court gave the following curative instruction as part of its final jury instructions:

> Now, in this connection, during closing argument Mr. [Joseph] Poluka stated that Ms. Graves testified that she and/or others tore up or trashed some documents. I instruct you that you may not consider those statements by Mr. Poluka that he mistakenly made. The Court has determined that Ms. Graves did not testify that anyone ripped up, shredded, destroyed or otherwise withheld documents from the Government, nor did any of the other witnesses testify that documents were destroyed or otherwise withheld from the Government, nor is there any documentary or other evidence from which you might infer that documents were destroyed or withheld from the Government.

Tr. at 2283–84.

The defendants argue that the instruction was insufficient for two reasons: (1) the jurors could have inferred that evidence regarding document destruction actually did exist and that the prosecutor's statement was accurate, but that the Court instructed them to disregard it because the Court had ruled the evidence inadmissible; and (2) it reinforced the impression that the prosecutor's argument was merely impermissible rather than false.

ing the government's interview with Ms. Graves on September 2, 8, 9, and 21, 1999, and on May 24 and October 1, 2000 make no reference to document destruction. There is no mention of document destruction in Ms.

In evaluating the effect on the jury of this improper argument, the Court observes that any charge of document destruction is highly inflammatory. Recent events relating to the collapse of Enron and the criminal prosecution of its independent auditor, Arthur Andersen, for document destruction were the subject of intense coverage by the national news media before and during the trial of this case. On March 11, 2002, the first day of trial in this matter, a Philadelphia Inquirer article described document-shredding at Andersen in anticipation of an investigation by the SEC and speculated that Andersen might be indicted for obstruction of justice. On March 15, 2002, the day of opening statements in this case, a front-page article in the Philadelphia Inquirer reported that the Department of Justice had indicted Andersen for obstruction of justice in connection with its shredding of documents. In a case such as this, where the issue for the jury was the defendants' intent, any evidence of document destruction would have been very relevant and powerful evidence.

B. *Arguments Relating to John Dolan*

■ John Dolan was indicted along with the other defendants in one count for concealing material facts from the United States Customs Service in violation of 18 U.S.C. § 1001(a). Mr. Dolan allegedly concealed documents from Agent McCrossan, the case agent. The Court severed Mr. Dolan's case from the other defendants.

Defense counsel moved *in limine* to prohibit the government from introducing evidence or arguing that Mr. Dolan's produc-

Graves' grand jury testimony on September 9, 1999. The defendants point to these facts to argue that the prosecutor could not have confused her trial testimony with earlier testimony.

tion to Agent McCrossan of Government Exhibit 11 on February 5, 1997 and of eleven documents on February 18, 1997 was misleading. The government argued that the evidence should be admitted because the production of Government Exhibit 11 showed that Mr. Dolan was lying by "in effect saying we [Purolite] were told not to do business with this company [Galax] and we're not doing it." Tr. at 1202–03. The government argued that the production of the eleven documents on February 18, 1997 was misleading because after the grand jury issued a subpoena, "instead of 11 pages being produced, over 4000 pages were produced." Tr. at 1201.

The Court ruled that these inferences were impermissible. Agent McCrossan could testify only as to how he had obtained the documents, but without any characterization and without any suggestion that Mr. Dolan had lied:

THE COURT: Now let's go to the documents—well, let me first say this. *The only way I would allow this testimony in would be as clean—just cleanly, no characterization, no evaluation by the agent . . . .*

. . . [I]t's relevant, it's the collection of documents, [but] *we're not at the stage where somebody is going to argue an inference from it.* So, Mr. Downey, What is the objection to, you know, clean testimony about getting these eleven documents?

MR. DOWNEY: . . . absent the characterizations the government wants to put on it, there is no wrongful intent demonstrated by it and it shouldn't be offered.

I would also say that, even if we avoid inflammatory terms like what Mr. Dolan is charged with and that type of thing, *the notion that the agent is being lied to, that type of testimony being offered is extremely prejudicial.*

THE COURT: *That's not coming in. What do you mean, the agent was lied to? That wouldn't come in.*

Tr. at 1209–1211 (emphasis added).

The prosecutor then reassured the Court that he would not use the testimony to show that Mr. Dolan had lied:

Your Honor, the main inference I want to draw—and we're not here to try Mr. Dolan, I wholly agree with Mr. Downey about that. . . . *[T]he inference I want to draw is not necessarily that Mr. Dolan is a liar,* although I think he did and that's the next case, but *the fact is that Customs come out, is asking questions, and then the company makes a decision and starts shipping from the U.K. and billing from the U.K., that's the inference the government wants to draw.*

Tr. at 1211–1212 (emphasis added). When the Court questioned why this inference required the government to sponsor testimony regarding the production of documents, the prosecutor explained that "it's not going to make a whole lot of sense if they don't talk about the documents. . . . [T]he jury should know there was at least some interchange of records." Tr. at 1216. Thus, the prosecutor represented to the Court that he would use the testimony only to show that there were meetings during which Jack Dolan provided documents to Agent McCrossan and that, after those meetings, Purolite's sales to Cuba were shipped from and billed to the entity in the United Kingdom.

The Court ruled that the prosecutor could mention the documents for this limited purpose, but reiterated its ruling prohibiting any adverse inferences:

I guess there could be some general statement [regarding the production of documents], *it's just that I don't want there to be any inference—I just don't see any negative inference that can be*

*drawn from it* and so, therefore, I'm reluctant to allow open-ended testimony about this subject.

Tr. at 1216 (emphasis added). The Court went on to exclude any mention of the exact number of documents that Mr. Dolan produced at the February 18, 1997 meeting:

No mention of—see, I think once you start asking about how many documents, eleven, I mean right away the inference is that somehow there was something wrong with the number of eleven and I just haven't heard that—there's no subpoena, we're not—*it's just too murky for me to allow it.*

Tr. at 1218–19 (emphasis added). The Court told the prosecutor, however, that he could "do what [he] need[ed] to do to make the linkup with the shift from the U.S. to the U.K." Tr. at 1219.

During closing argument, the prosecutor argued the impermissible inferences that the Court had disallowed. He characterized Mr. Dolan's production of Government Exhibit 11 at the February 5, 1997 meeting as a lie:

McCrossan looks at the records, something doesn't look right, it looks like there's shipments to Cuba, so he sets up a meeting with Mr. Dolan on February the 5th. Dolan leaves the room, he comes back, guess what he gives him? Government 11, *implying without saying that we're not selling to Cuba. There was a sale in 1992, the auditors found it and we stopped. That's a lie, that's an outright lie.*

Tr. at 2016 (emphasis added). The prosecutor then repeated this argument as he concluded his closing argument:

The last thing I want to say, ladies and gentlemen, I want to talk one more time about Government Exhibit 11 . . . you saw this memo again a second time on February 5th, 1997, when Jack Dolan

gives it to Andy McCrossan. We're not doing it, guys, the boss said we're not doing it in 1993, we're not doing it. *That was a lie.*

Tr. at 2026 (emphasis added).

The prosecutor also violated the Court's order not to mention the number of documents produced by Mr. Dolan at the February 18, 1997 meeting. Agent McCrossan testified only that Mr. Dolan had produced "some additional documents" at the meeting, without characterizing the number. Tr. at 1255. But the prosecutor argued that "Jack Dolan gives him, I don't know, I think Agent McCrossan said a *few pages.*" Tr. at 2016–17 (emphasis added). The prosecutor explained that McCrossan still wasn't satisfied "with these 'few pages' and basically asked that a prosecutor be assigned and a grand jury investigation opened and that was done." Tr. at 2017. Thus, the prosecutor made plain that Mr. Dolan had not been forthcoming in producing the "few pages," that Mr. Dolan was attempting to conceal the sales to Cuba, and that the company withheld documents until forced to disclose them by a grand jury subpoena. The defense objected to the government's arguments about Mr. Dolan.

The government concedes, as it must, that this argument was improper. It was improper for several reasons: (1) it violated the Court's specific rulings; (2) there was no evidence in the record to support it; (3) whether Agent McCrossan was satisfied or not by what the defendants did, and whether Agent McCrossan thought that something did not "look right" is irrelevant and prejudicial; and (4) it was inflammatory to use the word "lie" about Mr. Dolan's conduct.

Agent McCrossan testified that he received information from an undocumented

confidential source that Bro–Tech was violating the OFAC regulations. He then called Mr. Dolan and arranged a meeting at Bro–Tech. The meeting took place on February 5, 1997. Agent McCrossan explained to Mr. Dolan that he had received information about possible illegal exports by Bro–Tech. Mr. Dolan said that he had researched their files based on the previous phone call and he could locate only one document relevant to the names Agent McCrossan had provided him. Mr. Dolan then left the meeting and returned with Government Exhibit 11—the April 1993 memorandum from Stefan Brodie to all sales offices. Agent McCrossan testified that he had shown Mr. Dolan one or two documents from which it appeared that Bro–Tech, Galax and Nova Container were involved in the transaction. Mr. Dolan told Agent McCrossan that it appeared that the Ontario office was directly involved with the sale and that he would make inquiries and ask for records from the Ontario office. Mr. Dolan said that he would contact Customs when he received the records so that Customs could review them.

Mr. Dolan then called Agent McCrossan sometime later and set up a second meeting at Bro–Tech, that occurred on February 18, 1997. Mr. Dolan gave the agent several documents at that meeting. The agent asked for additional information and Mr. Dolan said that he would provide it. Shortly thereafter, Agent McCrossan requested that a prosecutor be assigned to the matter and a grand jury subpoena was issued in April, 1997.

From this testimony, the prosecutor argued that Mr. Dolan lied when he gave Agent McCrossan the document on February 5, 1997. It is speculation to conclude from this testimony that Mr. Dolan lied. There was no evidence of Mr. Dolan's knowledge or conduct prior to February 5,

1997. There was no basis from which to conclude that Mr. Dolan knew about the sales when he gave Agent McCrossan the document. Apart from being in violation of the Court's orders, therefore, there was no evidence in the record to support such an inference. The prosecutor's arguments were especially unfair because defense counsel relied on the Court's rulings in limiting its cross-examination of Agent McCrossan.

The Court gave the following curative instructions during its final jury instructions:

> Also in closing argument, Mr. Poluka suggested that you should draw a negative inference against the defendants from the fact that Mr. Dolan gave Agent McCrossan on April 7th, 1993 memorandum when Agent McCrossan first visited Bro–Tech Corporation on February 5th of 1997. I instruct you that you may not consider that inference or that argument that was made by counsel. The Court has determined that the fact that Mr. Dolan produced only—I believe it was Government Exhibit 11 and not additional documents at the time of that meeting with Agent McCrossan does not support the inference that Mr. Dolan, or Bro–Tech Corporation or any of the other individual defendants, lied to or intended to mislead Agent McCrossan regarding the sales to Cuba, nor may you draw any other inference adverse to the defendants from the circumstances of that meeting.

Tr. 2284.

C. *The Argument That Stefan Brodie Lied About the 1992 Sale to Galax*

 According to the prosecutor, Stefan Brodie told Mr. Coulter, the auditor, that "[t]he sale [to Galax in 1992 which was discovered during the Deloitte audit in 1992] was inadvertent, done by a new guy

and it was a one time sale." Tr. at 1998. The prosecutor then characterized this statement as "a double lie, that was a pack of lies, not only to Mr. Hennessy, but to the auditors." Tr. at 1998.

There was no factual basis for this statement. First, Stefan Brodie did not tell Mr. Coulter that the sale to Galax was "inadvertent;" he said that "it was a single transaction by a salesman that was new to the company." Tr. at 101. The "inadvertent" language that the government quotes is from the audit report written by Mr. Coulter, not from a statement by Stefan Brodie. Gov't Ex. 4. It is clear that this information did not come from Stefan Brodie because Mr. Coulter said it came from Bro–Tech's lawyers: "[i]t's the characterization of the legal opinion we received *from the company's counsel.*" Tr. at 106.

Second, the government's assertion that Stefan Brodie lied by stating that there was a single transaction is not supported by any evidence that Stefan Brodie knew about more than one transaction with Cuba in 1992. Mr. Coulter's audit uncovered, and he informed Stefan Brodie about, only one Galax transaction. Tr. at 91. In the same time frame, Mr. Grossman testified that Stefan Brodie told Mr. Grossman about a single Galax transaction, which may have been the same one that Deloitte discovered during the audit.

Tr. at 501. Thus, the evidence shows that, at that time, Mr. Coulter, Mr. Grossman, and Stefan Brodie knew about only one Galax sale. The government's assertion that Stefan Brodie knew about all four sales is a misstatement of the evidence. The government conceded this.[4]

The Court is concerned about a prosecutor arguing that a defendant, who took the stand, lied or uttered a "pack of lies." The government appears to concede that it would be improper to characterize a defendant's trial testimony in this fashion; but, argues that it is proper to characterize a defendant's pretrial conduct in this fashion. It is the Court's view that it is never proper to throw around such inflammatory language in a criminal trial, especially when it is used to describe a defendant. But even if it were proper to use that language about pretrial conduct when a defendant does not take the stand, there is no way to separate pretrial conduct from trial testimony in this case. The prosecutor in essence called Stefan Brodie and Mr. Dolan liars.

### D. *Rebuttal Arguments*

### 1. *Vouching*

■ The defendants argue that the second prosecutor, Michael Levy, made several improper arguments during rebuttal. During their closing arguments, defense

---

4. According to the prosecutor, the jury could infer that the defendants were willfully violating the law because Mr. Coulter told them they were not permitted to rebook the transactions:

> You saw one of the exhibits … where Ed Grossman writes … reverse the cash over to the U.K. Well, that's not good enough for Mr. Coulter. *He says, no, uh-uh.* First of all, that's not what happened, it was booked and invoiced right here in Bala Cynwyd, *you can't do that;* and secondly, he says, well it still might—*even if you could, it could be a problem because you own the corporation. It's all one big company.*

Tr. at 1997 (emphasis added).

This characterization is not supported by the evidence. Mr. Coulter did not say "no, uh-uh" or "you can't do that" or that "it could be a big problem because … it's all one big corporation." Rather he stated that:

> After considering it, we felt like we would still need a legal opinion because the *sales* transaction was initially recorded in Bro–Tech Corporation's books to begin with, and then even if it were transferred to Bro–Tech, Limited, *we would not know the legal implications of that either.*

Tr. at 107 (emphasis added).

counsel characterized the government's case as overreaching, directing the jury's attention to statements by the prosecutor that were not supported by the evidence. Mr. Levy did the rebuttal and argued as follows:

> I'm going to pick up where Mr. Downey left off, talking about a mistake that Mr. Poluka had made in the testimony of Joan Graves. Now, they [defense counsel] are able to give you quotations because Mr. Downey has been getting daily transcript and reading it to you, Mr. Poluka has been relying on his memory, and what was established for you here was not as bad faith, not as overreaching, not some evil motive, but as humanity. He's a human being and he's fallible, he made a mistake and that's all there is to it, and we all do from time to time. What you have seen from Mr. Poluka is something I've known for a long time, a man who is passionate and committed about his work, but I think you've also seen a man who is extremely fair and tries his best to do what is right.

Tr. at 2244–45.

The defendants argue that Mr. Levy, as a prosecutor, improperly vouched for Mr. Poluka's character. The Third Circuit has held that prosecutors may not inject the character of the prosecutor into the trial. "Time and again, we have emphasized that a prosecutor bears a special responsibility not to abuse the prestige that accrues to his office." *United States v. DiPasquale*, 740 F.2d 1282, 1296 (3d Cir.1984) (listing cases); *see also United States v. Pungitore*, 910 F.2d 1084, 1125 (3d Cir.1990) (disapproving prosecutor's argument that "attempted to bolster the credibility of testifying law enforcement personnel and the prosecutorial team by invoking facts which had no foundation in the record").

The government did put the character of Mr. Poluka into the trial. The government argues that any vouching was excused by the reply doctrine. "The doctrine teaches that where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." *Pungitore*, 910 F.2d at 1126.

A threshold requirement for the use of this doctrine is an improper attack on the prosecutor by defense counsel. If defense counsel makes an improper attack, "the prosecutor at the close of the defense summation should ... object[ ] to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury." *United States v. Young*, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

Here, there was no improper argument by defense counsel. Mr. Levy made it clear that he was responding to Mr. Downey's argument on overreaching that Mr. Downey made at the end of his closing, right before rebuttal. Mr. Downey's argument that the prosecutor was overreaching was based on the misstatements of the record that were made by Mr. Poluka. At the trial and in its opposition to the new trial motions, the government has conceded that most, if not all, of the arguments challenged by Mr. Downey were improper. There was, therefore, no basis to reply.

### 2. *Facts Not in Evidence*

The defendants contend that the second prosecutor argued facts not in evidence. The prosecutor claimed that the defense counsel were able to give quotations from the witnesses because Mr. Downey was getting daily transcripts and Mr. Poluka had to rely on his memory. Not

only was this fact not in evidence, it was not true. The prosecutor had the transcripts, but had not read them. The prosecutor also invited the jurors to sympathize with the government as the underdog and suggested that the defendants' wealth had placed the government at a disadvantage.

The defendants also challenge a comment by the government about the lack of evidence of other companies doing business in Cuba. The Court granted the government's motion to exclude the testimony of Kirby Jones, a defense expert who would have testified, among other things, that many American companies have extensive business relationships with Cuba. The Court did allow counsel for Mr. Sabzali to cross-examine witnesses about statements in several documents entered into evidence by the government that other companies were talking about trading with Cuba. Defense counsel argued in closings that Mr. Sabzali may not have known the sales were illegal because other companies were doing the same thing. In its rebuttal argument, the government argued that "those documents, ... show that there were American companies that may have been thinking about talking about trading in Cuba, you have not heard any evidence and you have not seen a single document that shows that they are." Tr. at 2250. The defendants argue that it was improper for the prosecutor to argue the lack of evidence that there were other companies trading with Cuba when the government successfully argued to exclude such evidence.

These statements, alone, would not be a basis for a new trial. In the context of the trial as a whole, the statements do not rise to the level of serious prejudice that calls the verdict into question. The statements do add, however, to the cumulative effect of the other improper arguments.

3. *Willful Blindness*

■ The defendant's final challenge to the prosecutor's rebuttal involved the government's use of the phrase "willful blindness." During the charging conference, the Court spoke at length with counsel about whether a willful blindness instruction was appropriate. The defendants argued that it was not. The government argued that such an instruction was appropriate because the defendants had been willfully blind to the factual circumstances related to the sales to Cuba:

> The final lines of cross-examination with Don Brodie were that he knew Sabzali was selling Purolite products in Cuba, he never inquired where it was manufactured, never inquired where it was shipped from, never inquired where it was booked, and never inquired what bank accounts were being used to deposit the money. If that isn't I think willful blindness, that he knows that they're transactions with Cuba, he knows that's a problem. He knows that it's going on and doesn't ask, where is this coming from. I can't think of a better example of willful blindness than what we have in this case.

Tr. at 1919.

The Court ultimately ruled that such an instruction was appropriate, but repeatedly cautioned the government that willful blindness could be used only to show knowledge of essential facts, not to prove willfulness. "I do think that the factual setup here is a willful blindness factual setup." Tr. at 1963. "[Y]ou can have a willful blindness instruction in a specific intent crime. *It just has to be clear that it goes to knowledge.*" Tr. at 1964 (emphasis added). "I'm very, very sensitive to the fact that it does not go to willfulness." Tr. at 1965. The Court cautioned the government not to use the willful blindness doc-

trine to prove willfulness: "And you're only discussing it on the knowledge prong, and not on the willfulness prong." Tr. at 1972.

The prosecutor made the following comments about willful blindness during his rebuttal argument:

The April 7th memo, G–11 goes out and suddenly we're using the code word, Caribbean. Don Brodie just looks at it and he signs it. Does he ask Sabzali, what's this? No, he goes to Mr. Grossman. Now, Mr. Grossman got his orders from the Brodies. *Does he call up the lawyers, Mr. Hennessy and Mr. Griffin, and say can I do this?* You know, this is fresh in my mind right now. *No.*

Tr. at 2249 (emphasis added).

[Stefan Brodie] never goes back to Hennessy and says I really need detailed advice on how to comply with these laws, this is tough and I need something more than a three-paragraph memo that we generated when I didn't really understand what this was about. Does he do that? I mean, he's flying with Joe Hennessy, he tells you, at least once a month to Europe, all he has to do is turn to the guy next to him in the seat in the airplane and say help me out on this one. Hennessy says, after the memo, that was the end of the involvement. He had a couple more conversations with Joe Griffin. There's no memo, there's no file of any kind at Morgan Lewis & Bockius on this issue.

Tr. at 2253.

I mean, if [Stefan Brodie]'s got all of this going around him, why doesn't he pick up the phone again and call Joe Hennessy and say, Joe, I've got people talking in cryptic terms, they're using code words, can I at least ask them?

Because if I can't this is silly. He doesn't do that.

Tr. at 2255.

They not only made themselves blind to the facts, *they made themselves blind to the law by not really seeking full legal advice* when they began to understand the complexity of the problem.

Tr. at 2257 (emphasis added).

They were … a few phone conversations away from Joe Griffin, from Morgan Lewis, he was flying regularly to Europe with Joe Hennessy, and [Stefan Brodie] never says give me more advice about how to handle this problem.

Tr. at 2257.

The Court agrees that the prosecutor mixed up willful blindness to the law and the facts. The Court, gave the following curative instruction in its final instructions:

I want to stress this point, because Mr. Levy may have inadvertently suggested in his rebuttal that blindness to the circumstances surrounding the sales to Cuba may show willfulness. This is incorrect. Blindness to the facts, by itself, is not sufficient to find the defendants guilty. You must also find, as I have instructed you, that the defendants must also have known the law and intended to violate it.

Tr. at 2311.

Again, we have an unfortunate situation where the prosecutor violated the Court's specific instructions on how the concept of willful blindness could be argued to the jury. Here, however, the instruction was probably effective to cure the problem. The error dealt with a legal principle, and not inflammatory evidence as did the other improper comments by the prosecutor.

### E. *Cumulative Effect of Improper Comments*

The question the Court must answer is whether it is "highly probable that the errors did not contribute to the judgment." The high probability standard is met when the Court possesses a "sure conviction" that the error did not prejudice a defendant. *Mastrangelo*, 172 F.3d at 297. I do not possess such a sure conviction here.

Mr. Poluka told a story of deception, concealment, and obstruction. The problem is that the story was not supported by the evidence in some respects, and in one important respect, in violation of specific rulings of the Court. The most prejudicial arguments were that Ms. Graves testified that documents were destroyed, that Mr. Dolan lied to Agent McCrossan, and that Stefan Brodie lied to Mr. Coulter.

The Court is also very concerned about the impact on the jury of Mr. Poluka's repeated use of various forms of the word lie. "Lies," "double lie," and "pack of lies" were strewn throughout the argument. This language is inflammatory and has no place in the argument of an Assistant United States Attorney. These are words that stir up the jury to decide the case not on a fair and objective review of the testimony of the witnesses and the documents but on emotion.

The impact of these improper arguments was exacerbated by Mr. Levy's vouching for Mr. Poluka at the beginning of his rebuttal argument. When an extremely personable and able prosecutor tells a jury that the defendants have been shredding documents and lying to government agents and calls the defendants liars, and when a second prosecutor then tells the jury that the first prosecutor is passionate, committed, extremely fair, and tries to do what is right, it would have to be a very special jury that is not influenced by such argument. I cannot conclude that we had such a jury here.

I make this conclusion in light of my evaluation of the strength of the government's case. There was no dispute that Bro–Tech sold product to Cuba through intermediaries. The defense was that this was not done knowingly and willfully. In support of that defense, the defendants introduced the testimony of two lawyers who represented the defendants during the alleged conspiracy and gave them advice on how to structure sales to avoid the impact of TWEA and the CACRs and the effect of the foreign sovereign compulsion defense on their conduct.[5] Don Brodie and Stefan Brodie took the stand and explained their conduct to the jury. On the other side, there was evidence of using code words for Cuba and people being told not to mention Cuba at meetings in the United States. Although there was sufficient evidence to sustain the verdict as to the three defendants, I cannot say that it was such a strong case that the jury would not have been influenced by the prosecutors' improper arguments.

The government argues that although most of the challenged arguments were improper, the Court can and should find no prejudice because the Court gave curative instructions and the jury carefully considered the evidence as shown by its verdict. The Court did give strong curative instructions with respect to the arguments about document destruction, Mr.

---

**5.** Although the Court held pretrial that the defendants could not present a foreign sovereign compulsion defense to the jury, evidence that they were told that their conduct was not illegal because of the foreign sovereign compulsion defense was admissible on the question of their intent.

Dolan's conduct, and willful blindness. The defendants argue that they were not strong enough and that no instruction would have been able to cure the cumulative effect of the improper arguments.

The defendants' arguments concerning the curative instructions point up the difficulty in fashioning curative instructions to combat inflammatory arguments such as the ones made here. The Court's goal was to make sure that the jury did not consider the improper arguments in its deliberations, but not necessarily to criticize the prosecutor. Indeed, the Court concluded that any instruction that was highly critical of the prosecutor could be counter-productive. The prosecutor was extremely able and personable. There was no doubt in the Court's mind that the jury liked and respected him. The Court was concerned that to tell the jury that the prosecutor had done something wrong, as the defendants requested, may have caused them to disregard the Court's instructions. The Court agrees with the defendants that there were no curative instructions that could have cured the array of improper arguments made here.

The nature of the verdict and the attention paid by the jury throughout the trial and deliberations are the strongest factors that the government has in support of its argument that there was no prejudice. The Court has considered that argument long and hard but does not have a sure conviction that the jury was not influenced by the inflammatory and improper closing arguments.

### F. *Conclusion*

It is easier for a prosecutor, when giving a closing argument, to call the defendants names and misstate the evidence than to come to grips with the real evidence and carefully rebut the defenses that have been presented. But the latter is the job of an Assistant United States Attorney. The prosecutor in this case conducted himself throughout the complex pretrial proceedings and the trial as a skilled advocate and a person of integrity. Somehow, at the last minute, perhaps in the heat of a long and complicated trial, he got carried away. The Court can certainly understand that from a human point of view. But the Court cannot ignore conduct that may have prejudiced criminal defendants. It is with great reluctance that the Court grants the motion for a new trial.

An appropriate order follows.

### ORDER

AND NOW, this 13th day of June, 2003, upon consideration of the oral motions for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) of defendants Don Brodie, James Sabzali, and Bro–Tech Corporation; the Motion for Judgment of Acquittal of defendants Don Brodie and Bro–Tech Corporation (Docket No. 340); the Motion for New Trial of defendants Stefan Brodie, Don Brodie, and Bro–Tech Corporation (Docket No. 341); the Motion for a Judgment of Acquittal or in the Alternative for a New Trial of James Sabzali (Docket No. 338); the government's opposition to the motions; the supplemental filings of the parties; and following oral argument, IT IS HEREBY ORDERED that:

1. The motions for a judgment of acquittal of defendants Don Brodie, James Sabzali, and Bro–Tech Corporation are DENIED for the reasons stated in a memorandum of today's date.

2. The motions for a new trial of defendants Don Brodie, James Sabzali, and Bro–Tech Corporation are GRANTED for the reasons stated in a memorandum of today's date.

3. The motion for a new trial of defendant Stefan Brodie is conditionally GRANTED for the reasons stated in a memorandum of today's date.