IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS



**FILED**

June 03, 2020

**TAMARA CHARLES
CLERK OF THE COURT**

LICATION

**SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

PEOPLE OF THE VIRGIN ISLANDS,   )   **CASE NO. SX-2012-CR-076**
)
               Plaintiff,   )
)
       v.              )
)
JOSE VENTURA,          )
)
             Defendant.   )
                                )

Cite as: 2020 VI Super 63

**Appearances:**

**JOSEPH PONTEEN, ESQ.**
Chief Deputy Attorney General
Virgin Islands Department of Justice
Christiansted, VI 00820
*For People of the Virgin Islands*

**RONALD D. WOOD, ESQ.**
The Wood Law Office
Show Low, AZ 85901
*For Jose Ventura*[1]

**MEMORANDUM OPINION**
(Filed June 3, 2020)

**DONOHUE, SR., Senior Sitting Judge:**

¶1 **THIS MATTER** is before the Court on remand from the Supreme Court of the Virgin Islands for this Court to "consider . . . in the first instance," *Ventura v. People*, 64 V.I. 589, 596 (2016) ("*Ventura II*"), the new trial motion Jose Ventura ("Ventura") made after the jury found him guilty of first-degree murder. "Although Ventura's co-defendant, Jose Rivera ("Rivera"), did not file a motion for new trial, the

---

[1] Daniel J. Cevallos, Esq., was counsel of record when the motion addressed herein was filed. Attorney Cevallos withdraw with permission on appeal and Ronald D. Wood, Esq. was appointed in his place. On remand, Attorney Wood was granted leave to withdraw for personal reasons and Ernest E. Morris, Jr., Esq. was appointed. Attorney Morris later withdrew, and Attorney Wood was reappointed since his personal matter had been resolved by then.

Supreme Court nonetheless remanded his case as well, concluding that 'it would be manifestly unjust to deny Rivera the same opportunity simply because his counsel failed to make the same argument.'" *People v. Rivera*, 68 V.I. 393, 396-97 (Super. Ct. 2018) ("*Rivera III*") (quoting *Rivera v. People*, 64 V.I. 540, 587 (2016) ("*Rivera II*")). On remand, Rivera filed his own motion for a new trial based on newly-discovered evidence, which this Court has denied in a separate opinion of even date. *See People v. Rivera*, 2020 VI Super 64. For the reasons stated below, Ventura's motion for a new trial will also be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    The factual and procedural background of this case has been summarized in prior opinions of this Court and the Virgin Islands Supreme Court. *See generally People v. Ventura*, SX-12-CR-076, 2014 V.I. LEXIS 53 (V.I. Super. Ct. July 25, 2014) ("*Ventura I*"), *aff'd in part and rev'd on other grounds by Ventura II*, 64 V.I. 589; *see also People v. Rivera*, SX-12-CR-063, 2014 V.I. LEXIS 49 (V.I. Super. Ct. May 1, 2014) ("*Rivera I*"), *aff'd in part and rev'd on other grounds by Rivera II*, 64 V.I. 540. Ventura and Rivera were charged and convicted of first-degree murder for the 2001 kidnapping and killing of Virgin Islands Police Corporal Wendell Williams. They each moved for judgment of acquittal after the jury returned its verdict, which this Court denied. *See generally Ventura I*, 2014 V.I. LEXIS 53; *Rivera I*, 2014 V.I. LEXIS 49. Ventura also moved for a new trial, which the Court denied "but not on the merits. Rather, because Ventura's motion . . . was 'untimely filed,' the Court 'declined to address the substance.'"[2] *Rivera III*, 68 V.I. at 397 (brackets omitted) (quoting *Ventura I*, 2014 V.I. LEXIS 53 at *62).Ventura and Rivera each were sentenced to a term of imprisonment for life.

¶3    On appeal, the Supreme Court affirmed their convictions but "concluded that denying Ventura's motion for a new trial as untimely was in error because the People 'did not object to the late filing' and

---

[2] Ventura had only filed one document but included two requests within that document: a motion for judgment of acquittal and a motion for a new trial.

had waived the 'defense of untimeliness.'" *Rivera III*, 68 V.I. at 398 (quoting *Ventura II*, 64 V.I. at 617).

Both cases were remanded for this Court to consider Ventura's motion on its merits. On remand, the Court

granted the parties "leave to supplement their respective motion papers." *Rivera III*, 68 V.I. at 399

(quotation marks, brackets, and citations omitted). Ventura requested and was granted leave "to

supplement to his motion papers with his appellate brief." *Id.* at 401. Otherwise, the parties did not

supplement their respective positions on remand.

## DISCUSSION

### A. The People's Surresponse

¶4      Before turning to the merits of Ventura's motion for a new trial, the Court must first explain why

the People's surresponse to that motion must be reinstated. Initially, in addressing Ventura's motions, the

Court struck the People's surresponse because it was filed without leave. *See Ventura*, 2014 V.I. LEXIS

53 at *63. *See Ventura*, 2014 V.I. LEXIS 53 at *63 ("Because Ventura was the movant, the People were

only allowed to file a response in opposition to his motion. Their Reply to Ventura's Reply . . . was filed

without leave of court. Accordingly, the Court struck it from the record . . . and did not consider it in

reaching its decision."). There is no question that the Court had the authority to strike the surresponse

because "'a court has inherent authority to strike any filed paper which it determines to be abusive or

otherwise improper under the circumstances.'" *People v. Roberts*, 70 V.I. 168, 172 (Super. Ct. 2019)

(quoting *In re: Asbestos, Catalyst & Silica Toxic Dust Exposure Litig.*, 68 V.I. 507, 515 (Super. Ct. 2018).

But courts are not obligated to strike papers filed late or without permission, or even by non-parties. *Cf.*

*id.* ("'[I]it does not follow that courts should always strike untimely-filed papers just because they were

filed late.'" (quoting *Der Weer v. Hess Oil V.I. Corp.*, 64 V.I. 107, 127 (Super. Ct. 2016)); *accord In re:*

*Alumina Dust Claims*, 67 V.I. 172, 188 (Super. Ct. 2017) ("Documents filed by nonparties *can* be stricken

from court files." (emphasis added)). Instead, the decision to strike papers from the record is discretionary.

*See Der Weer*, 64 V.I. at 127 ("A pleading or other paper on file, that is so defective in form, or so improper in substance, that it ought not to be placed on file, or a pleading or paper placed on file without right to file it, may, on motion, be stricken from the files; and the court may, *sua sponte*, order such pleading or paper stricken from the files. The court has control of its files and its records, and the object of an order striking pleadings or papers from the files is simply to disencumber the files and the records of the court of papers that are in themselves improper and objectionable, or that are improperly placed on file." (ellipsis and citation omitted)). Thus, since the decision to strike something from the record is discretionary, courts can disregard late-filed papers or papers filed without permission instead of striking them. *See Roberts*, 70 V.I. at 172 ("[W]hen motion papers are filed late, courts can strike them, or dismiss an untimely motion or disregard an untimely response or reply . . . ." (citation omitted)); *accord In re: Kelvin Manbodh Asbestos Litig. Series*, Case No. SX-97-CV-514, *et seq.*, 2018 V.I. LEXIS 96, *16 n.14 (V.I. Super. Ct. Sep. 19, 2018) (deciding to disregard rather than strike an opposition filed by a nonparty).

¶5      As noted, the Court struck the People's surresponse because it was filed without leave and "only a motion, a response in opposition and a reply are allowed unless leave of court is granted." *Ventura I*, 2014 V.I. LEXIS 53 at *63 (citing D.V.I. Local R. Civ. P. 7.1(a); D.V.I. Local R. Crim. P. 1.2; and Super. Ct. R. 7). But more importantly, Ventura had raised new arguments in his reply to support his motion for a new trial. (*Cf.* People's Reply to Def.'s Reply Br. 4, filed Mar. 12, 2014 (hereinafter "Surresponse") ("Ventura now raises a new reason that he is entitled to a new trial that was not in his original Motion for New Trial.").) Generally, "it is improper for a party to raise an issue for the first time in a reply brief in Superior Court, because the opposing litigant is not, as a matter of course, given an opportunity to respond to that new argument . . . under the rules governing standard motion practice in Virgin Islands trial courts." *Braithwaite v. Xavier*, 71 V.I. 1089, 1100 (2019). For this reason, arguments raised in reply papers are generally deemed waived. *See id.* (citing *Perez v. Ritz-Carlton V.I., Inc.*, 59 V.I. 522, 528 n.4 (2013)).

Rather than notify the Court that Ventura waived his new argument because he raised for the first time in his reply, or request leave to respond, the People instead filed a surresponse without leave and addressed the argument on the merits. The Court struck it, acting *sua sponte*. On further reflection, the Court finds that it must reinstate the People's surresponse. Three reasons support this conclusion.

¶6     First, the People filed their surresponse on March 12, 2014. The order striking it was entered on April 10, 2014. In the intervening weeks, Ventura did not move to strike it or object. He may have forfeited the right to object. *Accord Ventura II*, 64 V.I. at 617 ("When a party fails to raise a defense of untimeliness, thereby forfeiting that defense, a court should proceed to the merits of a case. Here, the People admit that it did not object to the late filing of Ventura's motion for a new trial, and the Superior Court should have proceeded to address the merits of the motion." (citations omitted)). But more importantly, by responding to Ventura's arguments on the merits, the People waived the right to claim that Ventura waived his new argument. *Cf. Webster v. FirstBank P.R.*, 66 V.I. 514, 518 n.2 (2017) ("[T]he fact that FirstBank has briefed the issue on the merits without contending that the issue has been waived is sufficient for FirstBank to have waived waiver." (citing *Simpson v. Golden*, 56 V.I. 272, 281 n.6 (2012)). Thus, striking the surresponse *sua sponte* may have been in error. *Cf. Braithwaite*, 71 V.I. at 1100 (noting that generally the Superior Court should let the parties be heard before acting *sua sponte*) (citing *Malloy v. Reyes*, 61 V.I. 163, 175 (2014)).

¶7     Second, complying with the Supreme Court's mandate may require reinstating the People's surresponse. In remanding this case to the Superior Court, the Supreme Court, technically, did not reverse or vacate any portion of the April 10, 2014 order that struck the People's surresponse and denied Ventura's post-trial motions. (*Cf.* Order 1-2, entered May 4, 2016, *Ventura v. People*, S. Ct. Crim. No. 2014-0021 ("**AND NOW**, consistent with the Opinion of even date, it is hereby **ORDERED** that the Superior Court's May 2, 2014 judgment and commitment is **AFFIRMED** but that this case is **REMANDED** so that the

Superior Court may consider on the merits the issue of whether a new trial should be granted in the first instance.").) To be clear, this Court denied, not dismissed, Ventura's motion for a new trial.[3] By remanding Ventura's motion to this Court to consider it, the Supreme Court had to implicitly vacate the portion of the April 10, 2014 order that denied the motion. The Supreme Court did not "order[] the complete opposite," Hon. Jon O. Newman, *Decretal Language: Last Words of an Appellate Opinion*, 70 Brook. L. Rev. 727, 728 (2005), i.e., that Ventura be given a new trial. Instead, the Court remanded for a merits determination, which implies that the Court's denial of the motion had to have been implicitly vacated. *Cf. In re Morin*, 45 A.3d 39, 41 (Vt. 2011) ("The power to remand is essentially connected with the power to vacate."). In general, vacatur of an order has the effect of reinstating the *status quo ante*. *See id.* ("When a court vacates and sets aside a judgment, that eliminates the judgment and thereby returns the case to its status before the judgment was made. In many circumstances, this will leave a case in a procedural posture such that it requires further proceedings in the original court."); *accord Deprins v. Clark*, 566 F. App'x 608, 611 (9th Cir. 2014) ("Vacatur of an order creates a legal status the same as if the order never existed."); *Wagner v. Wagner*, 604 N.W.2d 605, 610 (Iowa 2000) (marriage reinstated) ("[I]f a judgment or decree of divorce is vacated or annulled, the marital rights, obligations, and status of the parties are revived and restored. The vacation of the decree places the parties in the status in which they were before the divorce." (citation omitted)); *People v. Cosme*, 599 N.E.2d 678, 678 (N.Y. 1992) (criminal charges reinstated) ("vacatur of the defendant's conviction had revived all of the counts in the indictment."); *Mani*

---

[3] Generally, if a court lacks authority to rule on a motion, the motion is dismissed, not denied. *Cf. Paul v. Raritan Supply Co.*, No. SX-97-CV-329, 2017 V.I. LEXIS 106, *8 (V.I. Super. Ct. July 13, 2017) (stipulation for dismissal filed by nonparties) ("[T]he Court cannot grant or deny relief here. Consequently, the stipulation must be dismissed."); *see also Der Weer v. Hess Oil V.I. Corp.*, 60 V.I. 91, 98 (Super. Ct. 2014) (pending motions can either 'ruled upon, *dismissed*, or withdrawn.'" (emphasis added) (quoting 56 Am. Jur. 2d, *Motions, Rules, and Orders* § 31 (2010)). Denying a motion, even as moot, technically constitutes a ruling. *Cf. Arno v. Hess Corp.*, 71 V.I. 463, 486-88 (Super. Ct. 2019). In this instance, the Court denied Ventura's motion for a new trial. *See Ventura I*, 2014 V.I. LEXIS 53 at *62 ("Because the Court denies the motion for new trial as being untimely filed, the Court declines to address the substance of the motion."). Having concluded that the Court lacked the authority to consider the motion because it was untimely, dismissing it, rather than denying it, may have been more appropriate.

*Med., P.C. v. Am. Transit Ins. Co.*, 957 N.Y.S.2d 636, 636 (App. Term 2010) (summary judgment motion reinstated) ("The order granted defendant's motion to vacate a judgment and the underlying order granting plaintiff's motion for summary judgment on default and, upon such vacatur, restored plaintiff's motion to the calendar."); *see also Bromberg v. People*, 136 Ill. App. 602, 603 (1907) (vacatur of vacatur reinstates initial order). Accordingly, for this Court to be able to consider Ventura's motion on the merits, the Virgin Islands Supreme Court had to have implicitly vacated this Court's denial of Ventura's motion and reinstated *status quo ante*. Reinstating the *status quo ante* might also have implicitly reinstated the People's surresponse.

¶8      Third, and most importantly, even if the Supreme Court's mandate did not implicitly reinstate the People's surresponse, the Supreme Court nonetheless remanded Ventura's motion to this Court to render a ruling, which would be incomplete without considering the People's surresponse. The crux of Ventura's argument for a new trial is in his reply, which is why the People filed a surresponse. (*See* Surresponse 4 ("Ventura now raises a new reason that he is entitled to a new trial *that was not in his original Motion for New Trial.*" (emphasis added)).) In other words, Ventura's initial "argument" for a new trial was perfunctory, spanned two pages,[4] cited the wrong rule, and consequently, relied on non-binding authority,

---

[4] Ventura's entire argument for a new trial was as follows:

> Defendant incorporates each and every argument, fact, and allegation stated *supra* as if fully restated herein at length.
>
> Federal Rule of Criminal Procedure 33(a) provides that a judgment may be vacated or a new trial ordered "if the interest of justice so requires." Rule 33 expressly provides that the trial court, in its broad discretion, may set aside a jury verdict to prevent a miscarriage of justice. *See also, United States v. Perez*, 2003 WL 721568, *3 (S.D.N.Y. Feb. 28, 2003) (citations omitted):
>
> "In considering a Rule 33 motion, the district court must strike a balance between weighing the evidence and the credibility of witnesses and not 'wholly usurping' the role of the jury. Because a court generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated' that a trial judge may intrude upon a jury's factual determinations." *Id.* (citations omitted). While courts may disfavor motions for new trials and exercise "great caution" before granting them, "any error which would require reversal on appeal is a sufficient basis for granting a new trial." *United States v. Stiner*, 765 F. Supp. 663, 664 (D. Kan. 1991). Therefore, Rule 33 "may be applied when *the trial court does not believe that the evidence supports the jury's*

leaving the Court in the position of having to scour the record to make his argument for him, *contra Litwin Corp. v. Universal Oil Prods. Co.*, 69 V.I. 380, 387 (Super. Ct. 2018) ("[N]o court can make a movant's arguments for him when he has failed to do so." (quotation marks and citations omitted)), or find the argument waived. *Cf. Hess Oil V.I. Corp. v. Fluor Daniel*, 2020 VI Super 50 ¶ 19 ("[A]rguments or issues not raised by the movant or inadequately briefed are generally deemed waived.") Again, however, rather than that Ventura waived his request for new trial by not adequately briefing it, *cf. Toussaint v. Stewart*, 67 V.I. 931, 945 n.10 (2017); *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 428 n.13 (2016), the People instead submitted a perfunctory response in opposition.[5] Only in his reply did Ventura truly develop his

---

*verdict.*" *United States v. Brodie*, 268 F. Supp. 2d 420, 424 (E.D. Pa. 2003), citing *United States v. Dixon*, 658 F.2d 181, 193 (3d Cir. 1981) (emphasis added).

> When considering a motion for a new trial, "the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror." *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979).

> A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence if it "believes that there is a serious danger that a miscarriage of justice has occurred; that is, that an innocent person has been convicted. *United States v. Brennan*, 326 F.3d 176, 188-89 (3rd Cir. 2003). A district court's power to grant a new trial is much broader than its power to grant a motion for judgment of acquittal. *United States v. A. Lanoy Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992); *United States v. Capati*, 980 F. Supp. 1114 (S.D. Calif. 1997).

> Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion, it does not view the evidence favorably to the government, but instead exercises its own judgment in assessing the government's case. *Brennan*, 326 F.2d at 189. In other words, this Court sits as the "thirteenth juror" and independently evaluates the evidence, including the credibility of witnesses. *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3rd Cir. 1987); *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

> **CONCLUSION**

> For the above reasons, Defendant Jose Ventura respectfully requests this Court enter a judgment of acquittal, or, in the alternative, order a new trial.

(Def.'s Post-Verdict Mots. Pursuant to Rules 29 & 33 of Fed. R. Crim. P. Submitted Prior to Receipt of Trial Tr.; Mot. for Ext. of Time to Supp. Post-Verdict Mots. Upon Receipt of Tr.; & Reservation of Right to Supp. Upon Receipt of Tr. 21-22, filed Feb. 21, 2014 (alterations in original).)

[5] The People's response in opposition was:

> When assessing a motion pursuant to Fed. R. Crim. P. 33(a), the Court "exercises its own judgment in assessing the Government's case. However, even if [the Superior Court] believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted. *United States v. Silveus*, 542 F.3d 993, 1004-1005, 50 V.I. 1101 (3d Cir. 2008).

argument, devoting four out of twelve pages to explaining why he should be granted a new trial, allegedly because several witnesses perjured themselves. Since the People responded to Ventura's new argument, the Court believes that the safer route—under the unique circumstances presented here—is to vacate the portion of the April 10, 2014 order that struck the People's surresponse, reinstate it, and consider it in ruling on the merits. The Court cannot presume that the Supreme Court remanded this matter solely for the Court to issue a perfunctory denial. *Cf. Larrison v. United States*, 24 F.2d 82, 87 ("[I]it would be idle to return the record for the purpose of passing upon a motion that must be denied.").

## B. Ventura's Motion for New Trial

¶9     In ruling on a motion for a new trial, the Superior Court "may weigh the evidence and the credibility of witnesses, and if the court determines that there has been a miscarriage of justice . . . order a new trial." *Fahie v. People*, 62 V.I. 625, 632 (2015) (citing *People v. Morton*, 57 V.I. 72, 77 (Super. Ct. 2012)). On a new trial motion "the Superior Court is uniquely situated to weigh the credibility of witnesses . . . especially . . . where there is not an abundance of evidence indicating guilt and the credibility of . . . witnesses is, at best, questionable." *Ventura II*, 64 V.I. at 617 (citations omitted). And "[a] new trial must be granted when the verdict is against the interests of justice." *Gonsalves v. People*, 70 V.I. 812, 832 n.8 (citing Super. Ct. R. 135). But when "a motion for a new trial [is] premised on a challenge to the credibility of the witnesses, 'it remains the law that a trial court should weigh the evidence, but a new trial should not be granted unless the court believes that there is a serious danger that an innocent person has been convicted.'" *Percival v. People*, 62 V.I. 477, 491 (2015) (brackets omitted) (quoting *Stevens v. People*, 52

---

For the reasons discussed above, which the People incorporate as if fully restated herein, there is no serious danger that a miscarriage of justice has occurred. Given the evidence, there is no serious danger that an innocent person was convicted. Thus, this Court should deny the defendant's Motion for a New Trial

(People's Opp'n to Def.'s Mot. 18, filed Feb. 28, 2014 (brackets in original).)

V.I. 294, 306 (2009)).

¶10    As grounds for a new trial, Ventura contends that "at least three witnesses for the prosecution perjured themselves on the stand," which "was apparent to all only after their testimony that perjury had occurred." (*See* Def's Reply Br. to People's Resp. 9, filed Mar. 5, 2014 (hereinafter "Reply").) Specifically, he claims that Teresa Coogle ("Coogle"), the primary witness and only eyewitness, as well as two other witnesses, Jimmy and Hector Davis (collectively "the Davis Brothers"), perjured themselves. Relying on *Larrison*, Ventura claims that a new trial should be granted if:

1. The court is reasonably well satisfied that the testimony given by a material witness is false;
2. That without it a jury *might* have reached a different conclusion; [and]
3. That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Id.* at 8-9 (quoting *United States v. Meyers*, 484 F.2d 113, 116 (3d Cir. 1973) (citing in turn *Larrison*, 24 F.2d at 87)).

¶11    Ventura's reliance on *Larrison* is misplaced, however, because *Larrison* concerns *recanted* testimony. *See Larrison*, 24 F.2d at 85. Neither Coogle nor the Davis Brothers recanted their testimonies. Moreover, Ventura failed to point out that the United States Court of Appeals for the Seventh Circuit overruled *Larrison* eight years before Ventura filed his motion. *See United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004) ("Today, we overrule *Larrison* and adopt the reasonable probability test."), *vacated on other grounds*, 543 U.S. 1097 (2005). That would not preclude the Superior Court of the Virgin Islands, in the absence of binding precedent from the Supreme Court of the Virgin Islands or the Supreme Court of the United States, from following *Larrison*.[6] *Cf. Hughley v. Gov't of the V.I.*, 61 V.I. 323, 337-

---

[6] Ventura's motion would have raised a question of first impression: whether the Virgin Islands should follow *Larrison*. *See Gov't of V.I. v. Lima*, 774 F.2d 1245, 1251 n.4 (3d Cir. 1985) ("The *Larrison* test has not been adopted by this Court."); *see also People v. Stevens*, No. ST-06-CR-157, 2012 V.I. LEXIS 42, *12 (V.I. Super. Ct. Aug. 17, 2012) ("[U]pon subsequent research, the Court has found that *Larrison* has not been clearly adopted in this jurisdiction, but has merely been considered as persuasive authority where the newly discovered evidence suggests perjury by a material witness." (footnote omitted)). *But cf.*

38 (2014); *see Gov't of the V.I. v. Connor*, 60 V.I. 597, 604 (2014) (*per curiam*) (citing *Banks v. Int'l*

*Rental & Leasing Corp.*, 55 V.I. 967, 977-78 (2011)). But since Ventura complains of perjured testimony,

not recanted testimony, *Larrison* is not applicable here.

¶12     "All perjured relevant testimony is at war with justice, since it may produce a judgment not resting

on truth." *In re Michael*, 326 U.S. 224, 227 (1945); *see also United States v. Agurs*, 427 U.S. 97, 103

(1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and

must be set aside if there is any reasonable likelihood that the false testimony could have affected the

---

*United States v. Smith*, Crim. No. 88-146, 1990 U.S. Dist. LEXIS 18123, *6 n.1 (D.V.I. Aug. 30, 1990) ("The Court is aware that the Third Circuit has not flatly adopted the *Larrison* rule."). Nationally, two approaches have emerged to address recanted testimony: whether the result "might" be different or "probably would" be different without the testimony.

> One approach has been to treat the recantation as a form of newly discovered evidence. When a new trial is sought upon such evidence, the moving party must satisfy what has come to be known as the "*Berry*" test. This multi-part test, named after the case of *Berry v. State*, 10 Ga. 511 (1851), includes a requirement that the new evidence probably would produce a different result. *Berry* has been adopted in substance by most state and federal courts. . . . A second approach has been to treat recanted testimony as a problem distinct from newly discovered evidence. Perjured testimony affects the integrity of the judicial process in a way that overlooked evidence does not. Moreover, while a rigorous standard for obtaining a second trial upon new evidence may be justified as an incentive for the parties to marshal evidence and to present it at the first trial, the parties need no such incentive to combat perjury. The seminal decision establishing a distinct test for recanted testimony is *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928). . . . Those courts which fail to discern any functional difference between the recantation of trial testimony and the discovery of new evidence after trial have applied the *Berry* test in both situations. However, most courts now apply the *Larrison* test to recanted testimony.

*State v. Lawrence*, 730 P.2d 1069, 1071-72 (Idaho Ct. App. 1986) (paragraph breaks and all other citations omitted); *see also State v. Clark*, 125 P.3d 1099, 1104 (Mont. 2005) ("Since its creation, several courts have adopted the *Larrison* test, combined it with the *Berry* test, or noted it without commitment as to its authority or applicability in their jurisdiction." (citations omitted)). Some courts adopted *Larrison* but modified it. *See, e.g., State v. Britt*, 360 S.E.2d 660, 665 (N.C. 1987) (adopting modified *Larrison* test).

> The most common modifications to the *Larrison* test involve its second and third criteria. As to the second, which looks to the materiality of the evidence, the typical modification is to require more than a mere "possibility" that a jury might have reached a different conclusion. Instead, the more stringent standard of "probability" is applied. . . . The other common modification is to delete surprise as a separate criterion. . . . The one constant criterion under virtually every formulation of a test is that the trial court must itself be reasonably satisfied the challenged testimony or statements were actually false

*People v. Schneider*, 991 P.2d 296, 301 (Colo. App. 1999) (Briggs, J., dissenting) (citations omitted), *rev'd* 25 P.3d 755 (Colo. 2001). Several courts continue to follow *Larrison*, even after the Seventh Circuit overruled it in *Mitrione. E.g., Ortega v. State*, 856 N.W.2d 98, 103 (Minn. 2014) ("*Larrison* has been overruled . . . but we continue to apply its test in cases involving witness recantation and false testimony." (citing *State v. Caldwell*, 322 N.W.2d 574, 584–87 (Minn.1982)) (other citation omitted)); *State v. Jones*, No. 9911016309, 2008 WL 4173816, *16 n.102 (Del. Super. Ct. Sept. 3, 2008) ("Although Delaware still adheres to the *Larrison* test, that test is applicable only where the witness recants." (citations omitted)). Because both tests concern recanted testimony, the Court does not have to decide what test to adopt.

judgment of the jury." (footnotes omitted)). Neither the prosecution nor the defense may knowingly present perjured testimony at trial. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."); *Nix v. Whiteside*, 475 U.S. 157, 173 (1986) ("[T]here is no right whatever—constitutional or otherwise—for a defendant to use false evidence." (citation omitted)).

¶13    Even if a witness does lie under oath, "[i]t need not . . . obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact-finding tribunal must hear both truthful and false witnesses." *In re Michael*, 336 U.S. at 227-28. However, if "*undisclosed* evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," then the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103 (emphasis added) (footnotes omitted); *accord People v. Ward*, 55 V.I. 829, 842 (2011) ("A *Giglio* violation . . . is a type of *Brady* violation in which the undisclosed evidence reveals that the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false." (quotation marks and citations omitted)). With this background in mind, the Court examines the challenged witnesses' testimony, beginning with the Davis Brothers.

### (1) The Davis Brothers

¶14    Concerning the Davis Brothers, Ventura does not point to any specific falsities in their testimonies. Instead, Ventura claims that the Davis Brothers perjured themselves because the People expected them to lie and had "FBI impeachment witnesses . . . lined up and waiting to testify after the expected false testimony of the Davis Brothers." (Reply 11.) Based on this *ipsi dixit*, Ventura concludes that the Court should be "reasonably well satisfied that the testimony given by these material witnesses is false," *id.*, that

"[w]ithout the[ir] testimony . . . a jury would have reached a different conclusion—though the standard is only that the jury *might* have reached a different conclusion," *id.* at 12, and that Ventura was "taken by surprise." *Id.* Ventura emphasizes that he does not accuse the prosecution of misconduct. *See id.* at 9 ("Defense counsel is **not** alleging misconduct on the part of the prosecution in the perjury of the People's witnesses."). But even if the Court were to "assume that the People were unaware of the perjured testimony . . . a new trial is [still] warranted if the testimony was material, and 'the court is left with a firm belief that *but for* the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* at 10 (emphasis added) (brackets omitted) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

¶15     The People, in response, correctly point out that Ventura failed to show "what testimony was false and how defense counsel were surprised by such testimony." (Surresponse 4.) The People reject that Ventura's trial counsel, Daniel L. Cevallos, Esq., "an experienced criminal defense attorney, who is also a legal analyst and online columnist for CNN and HLN," *id.* at 5, could claim surprise that "the Davis brothers testified that they did not have any knowledge of, and never had a conversation with any of the defendants, regarding the death of Corporal Williams . . . ." *Id.* Even if the defense was surprised, Ventura was not prejudiced, the People assert. *See id.* ("Further, the Davis brothers' testimony that they knew nothing about the murder of Corporal Williams was not prejudicial to Ventura."). Since "Ventura cannot satisfy all three prongs in the *Larrison* case he cited," *id.*, "this Court should deny Defendant's Motion for a New Trial because this is not a case where there is a serious danger that an innocent person was convicted." *Id.* at 6.

¶16     Although the People give short shrift to the testimonies of the Davis Brothers, their testimony does give the Court reason to pause. Jimmy Davis ("Jimmy") was arrested during the trial and charged "with corruptly influencing a juror." *Davis v. People*, S. Ct. Crim. No. 2014-0036, 2014 V.I. Supreme LEXIS 40, *1 (V.I. Aug. 14, 2014) (*per curiam*). Despite the charge, the People still called Jimmy to testify.

When he took the stand, Jimmy immediately asked to speak with a lawyer, but outside the jury's hearing. The Court recessed, reached out to the attorney appointed to represent him in the related case, Mark Milligan, Esq. ("Attorney Milligan"), and asked if he could come to the courthouse. The People had offered Jimmy transactional immunity and he would have to be advised of his rights first.

¶17     In the interim, the People called Hector Davis ("Hector"). Hector had been flown in the night before from Texas, where he was serving time on a felony conviction. Shortly after taking the stand, Hector too asked to speak to an attorney, but within the jury's hearing. The Court immediately recessed and conferenced with Hector and trial counsel in chambers. Hector expressed concerns that he had not been fed until a few hours before coming to court and, more importantly, about his testimony. He asked to speak with the attorney who had been appointed to represent him years earlier in another case. Court records showed that his prior attorney was Thomas Alkon, Esq. ("Attorney Alkon"). Hector implied, but did not state directly, that his prior case was connected with this case against Ventura. The Court reached out to Attorney Alkon and also asked him to come to the courthouse to speak with his former client.

¶18     By then, Attorney Milligan had arrived and met with Jimmy. Outside the jury's presence, the People petitioned the Court for transactional immunity pursuant to Title 14, Section 20 of the Virgin Islands Code, which the Court granted. Jimmy testified, identified Rivera, and placed himself on St. Croix in June 2001. Beyond that, he denied all knowledge about the death of Corporal Williams and claimed that law enforcement officers "wanted [him] to lie on Mr. Rivera." (Trial Tr. 91:14-15 (Jan. 31, 2014).) Jimmy did admit to speaking with law enforcement officers about Williams's disappearance. But Jimmy testified that he told them did not know anything. Again, he said it was law enforcement officers who tried to get him to say that he had knowledge about the homicide. During direct examination, perhaps in an attempt to demonstrate his truthfulness, Jimmy told the jury that he "got arrested Wednesday for a juror, where somebody claimed, say I tampered with a juror. I never did tamper with a juror." *Id.* at 92:23-25.

The Court immediately ordered the jury taken out of the courtroom and instructed Jimmy to only answer the questions asked and not volunteer any other information. After the jury returned, the People asked Jimmy if he recalled telling an FBI agent that his brother Hector might have information about Williams's homicide, which Jimmy denied. The People then yielded the witness. On cross-examination, counsel for Rivera confirmed that Jimmy never signed any statements prepared by law enforcement officers.

¶19    In rebuttal, the People did call two FBI agents, Supervisory Special Agents Clifford Goodman and Kimberly Quesinberry. Special Agent Goodman testified that he spoke with Jimmy in Puerto Rico, where Jimmy had been taken for his own safety, and that Jimmy had told him that Rivera said that he (Rivera) and unnamed others took Corporal Williams's car because they wanted to use it to commit a crime. Jimmy also told Special Agent Goodman that Rivera had told him that he (Rivera) did not know that Williams was a police officer when they took his car. Goodman acknowledged on cross-examination that Jimmy never signed a document adopting those statements. When asked whether it was important to take accurate notes when interviewing people, Special Agent Goodman admitted that there can be "disputes about what was said . . . [by] the person interviewed." (Trial Tr. 104:22-23 (Jan. 31, 2014).) Goodman explained that "[i]t happens frequently for a variety of reasons." *Id.* at 104:24. Special Agent Quesinberry's testimony was largely the same, except that she contradicted Jimmy's testimony, telling the jury that Jimmy did tell her to speak with Hector. She also admitted on cross-examination—before Hector testified—that she had advised law enforcement officers that Hector "may not be viable as a government witness." *Id.* at 136:8-9. The reason: because Hector was a liar. *See id.* at 135:19-22 ("Q. Okay. And as I understand it, your opinion was that Hector Davis basically is a liar; correct? A. Yes, he did lie on a particular – on – on some particular things, that is correct." (line breaks omitted)).

¶20    Hector's testimony proceeded along similar lines. He also lacked any knowledge about the homicide. However, after meeting with Attorney Alkon, Hector insisted during a sidebar conference that

he had entered into a cooperation agreement with the People of the Virgin Islands in 2003. The Court

pulled a copy of a 2002 criminal case, *Government of the Virgin Islands v. Hector Davis*, Criminal No.

180/2002 (STX), from storage, which did have a cooperation agreement on file, under seal. But the

agreement was not signed by Hector, the prosecutor, or Attorney Alkon. But Hector insisted that a signed

copy did exist and stressed his desire to adhere to the agreement because he did not "want that agreement

hunt me down now, or in the future it haunt me back down." (Trial Tr. 17:10-12 (Feb. 3, 2014).) The

People then petitioned for transactional immunity for Hector, which the Court granted. But Hector simply

told the jury that he could not recall anything. *Cf. Ventura I*, 2014 V.I. LEXIS 53 at *7-8 ("Jimmy Davis's

brother, Hector, testified that he could not remember any discussions with law enforcement because of

medication he was taking for mental illness and depression that affected his memory.").

¶21     Again, in rebuttal, the People called Special Agents Goodman and Quesinberry. Special Agent

Goodman told the jury that during an interview on St. Croix in August of 2003, Hector told him that he

(Hector) was at his house (a date and time was not given) when Rivera drove up and asked Hector to

accompany him because he needed Hector to drive his truck back home. Hector jumped in the truck, riding

in the truck bed until they reached a four-door sedan. Williams was restrained inside the trunk with flex

cuffs. Sometime later, Rivera found out that Williams was a cop. Goodman then told the jury that Hector

told him (Goodman) that he (Hector) told Rivera that it "was fucked up to kill a cop." (Trial Tr. 37:21

(Feb. 4, 2014).) Rivera remarked "[t]hat it was no big deal, just a part of life." *Id.* at 37:24. Hector told a

slightly different version during an interview approximately two years later. In the more-recent version,

Rivera told Hector he knew Williams was a cop and admitted that "he had killed him and dumped him at

sea." *Id.* at 38:19-20. On cross-examination, Special Agent Goodman concurred with Special Agent

Quesinberry's assessment that Hector was not a viable government witness. *See id.* at 45:11-22. Special

Agent Quesinberry's testimony again largely corroborated Special Agent Goodman's testimony, except

that she told the jury that Hector told her that Rivera told him, when he asked why he killed Williams, that "they had to kill the policeman because he had a transaction with a Arab from the Jiffy Mart and Jose." *Id.* at 59:11-12. What the transaction involved or who Jose was were not explained. Hector also told Special Agent Quesinberry that Rivera and another person, Eurie Joseph, had offered to sell Williams's firearm to him (Hector). On cross-examination, Quesinberry acknowledged that Hector had signed a cooperation agreement with the federal government or the Virgin Islands government for a possible reduction in sentence if he provided useful information.

\* \* \*

¶22 Several aspects of the Davis Brothers' testimony are troubling. Ventura is not wrong in suggesting that "[t]he People were so expectant of their false testimony, that FBI impeachment witnesses were lined up and waiting to testify after the expected false testimony." (Reply 11.) But the Court cannot go so far as to find that the People knew that the Davis Brothers would give unfavorable testimony. Outside the jury's hearing, Hector had insisted on honoring his past agreement with law enforcement, which tends to show that he would testify truthfully. Moreover, both he and Jimmy were given transactional immunity. But once they testified, the People should have left well-enough alone. Instead, the People called the FBI agents after each Brother testified to impeach them. The problem is that the agents' testimonies exceeded the Davis Brothers' testimonies, essentially becoming "a mere subterfuge to get before the jury evidence not otherwise admissible." *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975).

¶23 Federal Rule of Evidence 607, which governed when this case was tried, *see Ventura*, 2014 V.I. LEXIS 53 at \*22 n.4, provides that "[a]ny party, including the party that called the witness, may attack the witness's credibility." Clearly, the prosecution can impeach its own witnesses, particularly if the witnesses do not testify as anticipated. But "the doctrine permitting impeachment of one's own witness under circumstances of actual surprise cannot be used as a ruse or a device with which to put into the

evidence what would otherwise be clearly inadmissible hearsay statements." *United States v. Michener*, 152 F.2d 880, 883 n.3. (3d Cir. 1945) (citations omitted); *accord Griffith v. State*, 31 N.E.3d 965, 968 n.4 (Ind. 2015) ("'[A] party is forbidden from placing a witness on the stand when the party's sole purpose in doing so is to present otherwise inadmissible evidence cloaked as impeachment.'" (quoting *Appleton v. State*, 740 N.E.2d 122, 125 (Ind. 2001)); *State v. Turecek*, 456 N.W.2d 219, 225 (Iowa 1990) ("The State is not entitled under rule 607 to place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible. To permit such bootstrapping frustrates the intended application of the exclusionary rules which rendered such evidence inadmissible on the State's case in chief.").

¶24    Hector had testified that he did not recall talking with Special Agent Goodman. (*See* Feb. 3, 2014 Trial Tr. 28:21-24 ("Q. Okay. Do you remember having a conversation on August 22nd of 2003 at Golden Rock with FBI Agent Clifford Goodman? A. I can't remember that." (line breaks omitted)).) When the prosecutor pressed him further, Hector said "[t]hat's twelve years ago, man. I do things, I been living all my life, I been doing all kind of thing twelve years ago. I forgot everything, you understand?" *Id.* at 29:8-10. The prosecutor pressed further, questioning whether Hector recalled telling the FBI about seeing Rivera with Williams before the murder or seeing William's firearm after. Hector finally said:

> I can't remember that. Prosecutor, I take sight medication now, I take depression, I take hearing voices, I take – with side effects. At the end of the day I can't remember all of that. All my life I'm taking medication – not all my life, but from since I went Texas I taking, you understand?

*Id.* at 31:7-12. Technically, Hector's testimony was unimpeachable – not because it was truthful or untruthful, but because he said he could not remember. Rather than try to refresh Hector's recollection with the statements the FBI agents took after they met with him or by questioning him about the cooperation agreement with law enforcement, the People ended Hector's testimony and solicited the

information they wanted from Special Agents Goodman and Quesinberry. That was improper because Hector's testimony was effectively unimpeachable. Special Agents Goodman and Quesinberry did not testify that Hector really could remember. *Cf. State v. Russell*, 893 N.W.2d 307, 317 (Iowa 2017) ("When a witness testifies that he or she does not remember the underlying facts, the only subject to be impeached is the witness's memory or ability to recollect." (citing *State v. Gilmore*, 259 N.W.2d 846, 857 (Iowa 1977)). To be sure, courts recognize that "where a witness makes a testimonial statement and then does not remember a prior inconsistent statement he made dealing with the same facts or is evasive as to that statement either party may introduce the prior inconsistent statement into evidence if certain foundation prerequisites are met." *Id.* (ellipsis, brackets, and citation omitted); *accord Hutson v. State*, 296 S.W.2d 245, 249 (Tex. Crim. App. 1956) ("Where the witness denies or testifies that he does not remember making a prior inconsistent statement, the adverse party may prove that he did make such statement." (citation omitted)). But here the prosecution called the agents to get into evidence the testimony that Hector would or could not give. That was improper.

¶25     Jimmy's testimony is similarly troubling because he did not deny speaking to the FBI. Instead, he claimed the FBI tried to get him to lie. When Special Agents Goodman and Quesinberry testified, the People did not ask them if they tried to get Jimmy to lie. Instead, they gave detail upon detail, testifying to out of court statements Jimmy made to them. In other words, the People elicited specifics from the agents that they could not get from Jimmy. This too was improper.

> Witnesses may, of course, sometimes fail to come up to the expectations of counsel and in such situations there is an understandable temptation to get before the jury any prior statement made by the witness. And it may be that in certain instances impeachment might somehow enhance the truth-finding process. Yet, whatever validity this latter assertion may have, it must be balanced against the notions of fairness upon which our system is based. Foremost among these concepts is the principle that men should not be allowed to be convicted on the basis of unsworn testimony.

*Morlang*, 531 F.2d at 190 (citing *Bridges v. Wixon*, 326 U.S. 135, 153-54 (1945)).

¶26    Most troubling here is that neither Davis Brother's prior statements to the FBI constituted prior inconsistent statements. "[P]rior inconsistent statements are admissible as non-hearsay when the declarant testifies and is subject to cross-examination about a prior statement, and the statement is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." *Canton v. People*, 61 V.I. 511, 518 (2014) (quotation marks, citation, and brackets omitted). The FBI agents were called for *impeachment* purposes to attack the credibility of the Davis Brothers. They were not supposed to give substantive testimony that Ventura and Rivera were guilty, i.e., that what Jimmy and Hector told them is what really happened. This is the concern here: "it is an abuse of the rule, in a criminal case, for the prosecution to call a witness that it knows will not give it useful evidence, just so it can introduce hearsay evidence against the defendant." *United States v. Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986) (quotation marks, brackets, and citation omitted).

¶27    But the Court cannot find that the People knew that Jimmy and Hector would *not* give useful evidence. *Cf. United States v. Buffalo*, 358 F.3d 519, 524 (8th Cir. 2004) ("[T]he proper inquiry is whether, as an objective matter and irrespective of the calling party's motive, the probative value of a statement for impeaching the credibility of a witness is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (quotation marks, brackets, and citations omitted)). Once the Davis Brothers failed to give useful evidence, the People should have known that calling Special Agents Goodman and Quesinberry to impeach them might lead to the admission of inadmissible hearsay evidence. *Cf. Morlang*, 531 F.2d at 190 ("[P]rior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for them to

distinguish between impeachment and substantive evidence."). The problem is that none of the Defendants objected,[7] and the Court did not, on its own, given a limiting instruction, which some courts have held constitutes plain error "if the jury could give substantive effect to the impeachment evidence." *United States v. Lewis*, 693 F.2d 189, 197 n.34 (D.C. Cir. 1982) ("[W]hen a party seeks to impeach a witness by prior inconsistent statements, it is plain error not to give an immediate limiting instruction if the jury could give substantive effect to the impeachment evidence." (citations omitted)); *accord United States v. Ince*, 21 F.3d 576, 581 (4th Cir. 1994) ("When the prosecution attempts to introduce a prior inconsistent statement to impeach its own witness, the statement's likely prejudicial impact often substantially outweighs its probative value for impeachment purposes because the jury may ignore the judge's limiting instructions and consider the 'impeachment' testimony for substantive purposes. That risk is multiplied when the statement offered as impeachment testimony contains the defendant's alleged admission of guilt. Thus, a trial judge should rarely, if ever, permit the Government to 'impeach' its own witness by presenting what would otherwise be inadmissible hearsay if that hearsay contains an alleged confession to the crime for which the defendant is being tried." (citations omitted)).

¶28    A new trial is only warranted if the error was prejudicial, however. *Cf. Williams v. People*, 59 V.I. 1043, 1049 (2013). Here, the Court cannot find any of these errors to be prejudicial because, even when the Davis Brothers' testimony is excluded, as well as the testimony of the FBI agents, the jury still heard from Coogle that "the person that shot [Williams] in his hand . . . was Jose Rivera, the person that shot

---

[7] In fact, after the People rested their case in chief and Rivera moved for judgment of acquittal, Rivera urged the Court to disregard the Davis Brothers' testimony entirely. (*See* Feb. 3, 2014 Trial Tr. 82:6-18 ("If I could start at the tail end of it, I would suggest that the testimony of both of the Davis brothers did not – there was substantive testimony that did not accuse my client of doing anything. The statements that were introduced to impeach those parties are not relevant as far as substantive evidence is concerned. And the only statement that my client had anything to do with any kidnapping of Officer Williams would be the statement of Hector Davis; and again, not his direct testimony, but only his impeachment statements. So there is no evidence of any participation in a kidnapping by Jose Rivera." (paragraph break omitted)).)

him in his mouth was Jose Ventura." *Rivera II*, 64 V.I. at 557 n.8 (quotation marks and citation omitted). Her testimony was sufficient for the jury to find Ventura and Rivera guilty. *See Ventura II*, 64 V.I. at 606 ("[T]he testimony of a single witness is sufficient to support a conviction, even if uncorroborated and contradicted by other testimony." (quotation marks and citations omitted)).

### (2) Theresa Coogle

¶29     Ventura also attacks Coogle's testimony, however, claiming the People engaged in prosecutorial misconduct when they "learned for the first time at trial that at the time of the incident Coogle was 1) pregnant; and 2) "back and forth" between Miami and St. Croix, and more likely simply in Miami, which means they learned that their primary witness had deceived them for over a decade." (Reply 11.) This "is enough evidence," Ventura contends, "to establish that Theresa Coogle gave false testimony at trial, that [her] testimony surprised the Defendants because it was different even from her multiple inconsistent statements, and this false testimony warrants a new trial." *Id.* In response, the People reject Ventura's claim of surprise, noting that his attorney had "all of Ms. Coogle's prior statements before Ms. Coogle testified." (Surresponse 4.) And *"even if* defense counsel was surprised, Ventura was still able to counter Ms. Coogle's testimony that she was on St. Croix at the time of the murder." *Id.* What's more, "[i]nconsistent statements by a witness do not render the witness' testimony false," the People counter, "especially when those statements are acknowledged and explained by the witness." *Id.*

¶30     As a threshold matter, courts do not assume witnesses lie under oath at trial. *See United States v. Johnson*, 621 F.2d 1073, 1075 (10th Cir. 1980) ("Appellants' claim of prejudice rests on the assumption that the testimony given by Fowler was perjured. However, we cannot assume, on the basis of Miller's testimony alone, that Fowler's testimony was knowingly false. . . . Furthermore, even if we were to accept the proposition that Fowler committed perjury in some portions of her testimony, a new trial is not mandated."); *Meece v. Commonwealth*, 529 S.W.3d 281, 294 (Ky. 2017) ("This trial occurred thirteen

years after the murders, and we cannot assume that every single discrepancy is an intentional lie or perjury. Memories alter and that is why we place value in a jury's truth-finding ability. The jury heard all the evidence, even the inconsistent evidence."); *Commonwealth v. Foerst*, 53 A.2d 847, 849 (Pa. Super. Ct. 1947) ("We cannot assume that Rosemiller perjured himself and the jury having apparently believed his testimony, there is ample evidence to sustain its verdict of guilty."); *accord Croghan v. Umplebaugh*, 162 N.W. 596, 597 (Iowa 1917) ("It would seem that one ought not to profit by his own wrong; that one ought not to retain the fruits of victory obtained through means of perjured testimony. But we cannot assume that the verdict of the jury is founded on false testimony."). The Court does acknowledge, however, that Coogle's testimony was less than ideal.

¶31     At the time of the homicide of Corporal Williams, Coogle was 17 years old and near or in her third trimester. Coogle admitted that she gave birth in Miami, Florida on July 29, 2001, approximately a month after Corporal Williams's death in June 2001. (*See* Trial Tr. 88:25-89:4 (Jan. 28, 2014).) Coogle also admitted that she had been living in Miami for some time before the homicide. Since she gave birth in Miami, she had to have flown to St. Croix before the homicide and returned to Florida after the homicide while approximately seven months pregnant. That was her testimony: that she "was back and forth from Florida and St. Croix" during the relevant time period (Trial Tr. 75:18 (Jan. 29, 2014).)

¶32     Coogle's testimony is at the heart of Ventura's argument. For this reason, the Court will excerpt a large portion of Rivera's cross-examination of Coogle for context:

> Q. Okay. Very good. Now, as I understand it, you had a child in July of 2000; is that correct?
> A. That is correct.
> Q. And you had another child on July [of] 2001.
> A. That is correct.
> . . . .
> Q. So it would be fair to say that at the time that you claim to have been seeing these events, you would have been eight months pregnant?
> A. Seven or eight. I had my son early.

Q. Okay. Seven or eight months pregnant, okay. Now, [redacted] was not born in St. Croix, was he?

A. No, he was not.

Q. He was born in Florida; is that correct?

A. That is correct.

Q. As a matter of fact, he was born in Miami, if I'm correct.

A. That's correct.

Q. Okay. And at the time he was born, you were living in North Miami, wouldn't you agree with that?

A. I was staying in North Miami.

Q. And you were staying with Mariela Velasquez?

A. That's correct.

Q. And with her brother Francisco Velasquez?

A. That's correct.

Q. And that's where you were living when your son was born in July of 2001?

A. I was staying there, correct.

. . . .

Q. Okay. Now, isn't it a fact, Ms. Coogle, that you had been living at that address with Mariela Velasquez, Francisco Velasquez for several months there in Florida?

A. I was back and forth from Florida and St. Croix.

Q. Well, let's talk about that. You went to Miami to live with Mariela Velasquez in March of 2001, didn't you?

A. I wouldn't say I went to go live; I would say I went to go stay. And I don't remember exactly the month. I went back and forth several times.

Q. Well, if I were to tell you it was March of 2001 that you moved there, would you quibble with me?

A. I do not remember the date and time.

Q. And you went there because your young daughter was having some kind of an ear problem; correct?

A. That's incorrect. I moved -- I went there to escape out of a abusive relationship that I had with Max Velasquez.

Q. Okay. And that was many months before the birth of your son . . . isn't that right?

A. I traveled back and forth throughout that time, yes.

Q. Isn't it a fact that when you were in Miami before your son was born that you worked at a Wendy's?

A. When I was in Miami, I did work at a Wendy's, yes.

Q. And Wendy's is a -- a fast food restaurant; correct?

A. That is correct.

Q. And what was your job at the Wendy's?

A. I did numerous amount of things.

Q. Such as?

A. I was a cashier, I did the grill. I did a lot of things.

Q. Okay. And you were doing this while you were pregnant with your son; correct?

A. Yes.

Q. All right. Isn't it a fact that -- well, do you -- while you were there in Miami, you also

had a boyfriend named Kenny, a guy with a red truck, do you recall that?

A. He wasn't a boyfriend; he was a friend.

Q. Okay. But he would come by and pick you up frequently; correct?

A. We went out on dinners, yes.

Q. Okay. Do you remember when you got the burn on your hand, the top of your hand, when you were living there in Miami with Mariela Velasquez and Francisco Velasquez?

A. I wasn't living there; I was staying there. And yes, I do.

Q. And as a matter of fact, Mariela had to call the Dade County Rescue, didn't she?

A. I don't think she was there. Nobody was there. I called 911 myself.

Q. And do you remember when the Dade County Rescue came and treated you there at Mariela and Francisco's place?

A. I do not know the date, no.

Q. But that was all taking place in Miami, and that event took place; correct?

A. That is correct.

Q. Okay. And you had some other jobs in Miami as well, didn't you?

A. Oh, yes.

Q. What else did you do in Miami?

A. To support myself, I stripped.

Q. Okay. Where -- where did you strip?

A. Well, when I was kicked out of the house that I was staying at with Mariela, I went and worked with a couple of the girls that worked at -- oh, I couldn't even remember the name of the club to tell you.

Q. Okay. So while you were in Miami, you were working at Wendy's for a period of time and stripping for a period -- period of time; correct?

A. That's correct.

Q. And isn't it a fact that in June of 2001, when you claimed to have seen these events, you were living in Miami with Mariela Velasquez and her brother?

A. That's incorrect. I was back and forth, and I was on St. Croix at the time of this homicide.

Q. And who were you staying with when you were back on St. Croix during the time of this homicide? Where were you living?

A. I was in between my mother's house and I also stayed in St. Thomas.

Q. Okay. Where did you stay in your mother's house. What's the address?

A. [redacted].

Q. And who else was there?

A. My two sisters, my stepfather and my mother.

. . . .

Q. And where were you staying in St. Thomas?

A. I was staying in a lot of hotels.

Q. In a lot of hotels?

A. Yes.

Q. And were you working in St. Thomas?

A. Yes.

Q. Where were you working?

A. I was also a stripper there.

Q. And at what place?

A. Club 75.

Q. Club 75?

A. Yes.

Q. And you're telling us that this was taking place in 2001?

A. I started dancing later on, at the end of the year 2001, on St. Thomas.

Q. I'm interested in where you were in June of 2001, not later in the year?

A. I was at my mother's.

Q. You were not in St. Thomas then; correct?

A. No.

Q. And you deny under oath that you were in Florida in June of 2001, is that what you're telling the ladies and gentlemen of the jury?

A. What I'm telling you is that the date of that murder, I was on St. Croix. Again I was back and forth, through Miami and St. Croix.

Q. Okay. Aside from the people that you have mentioned that were there -- that you say were there at the address, is there anyone else who can establish your presence here on St. Croix on June 14, 2001?

A. Not that I could think of at this present time.

*Id.* at 74:4-80:1. From this testimony—and the fact that Coogle signed several statements law enforcement officers prepared from their interviews of her but without reading them first, (*see, e.g.*, Hr'g Tr. 122:13-17 (Jan. 27, 2014))—Ventura claims the People engaged in misconduct because they learned first time at trial that Coogle was pregnant and "back and forth" between Miami and St. Croix, "which means they learned that their primary witness had deceived them for over a decade." (Reply 11.) However, Ventura is simply mistaken.

¶33    First, technically, the People did not learn *at trial* that Coogle was pregnant at the time of Corporal Williams murder. Coogle had testified extensively at a suppression hearing held the day before trial.[8] It was then that she testified that she was pregnant in June 2001. (*See* Jan. 27, 2014 Hr'g Tr. 126:25-127:3 ("Q. Ms. Coogle, were you pregnant in June, 2001? A. Yes, I was. Q. How many months pregnant were you? A. I was approximately, about six, maybe seven." (line breaks omitted)).) That was also when Coogle testified to having flown "back and forth" between St. Croix and Miami while pregnant. *Id.* at 149:8. This

---

[8] During trial, the case agent for the Virgin Islands Police Department, Detective Frankie Ortiz, did admit that he first learned that Coogle was pregnant during trial. (*See* Trial Tr. 141:22-25 (Jan. 30, 2014).)

information was elicited by the defense, specifically by Ventura's co-defendant Sharima Clercent.[9] Admittedly, the Court is "splitting hairs." But issues Ventura is raising requires such precision because Coogle's pregnancy and her travels during her pregnancy were not revealed for the first time at trial. *Larrison*, which Ventura relies on, requires that the defendant, not the prosecution, be surprised by testimony and not learn of its supposed falseness until *after* trial. *See Larrison*, 24 F.2d at 88 ("That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.").

¶34    Second, none of the defendants—five at the time of trial—claimed surprise by Coogle's testimony. In fact, it was the prosecution who repeatedly objected during the suppression hearing, arguing that defense counsel were using the suppression hearing as a quasi-deposition. (*See, e.g.*, Hr'g Tr. 86:14-17 ("I'm going to be objecting to them using this as a fishing expedition, to try and get into facts of the case, and proof of facts and trying to use this as a deposition of the witness.").) Counsel for Ventura disagreed, countering that it was not a deposition, just "a very wide inquiry." *Id.* at 89:15-16. The result of this wide inquiry" is that everything Coogle testified to at trial was elicited the day before trial. Yet, no one asked for a continuance. Thus, the Court rejects Ventura's claim that Coogle's inconsistences amount to perjury.

¶35    Ventura also takes issue with the plausibility of Coogle's testimony, that a 17 year-old girl regularly flew back and forth between St. Croix, St. Thomas, and Miami while pregnant, and happened to be on St. Croix where she witnessed a murder and helped clean up afterward. But Ventura did not follow up on any of those issues at trial. None of the defendants called any witness to rebut the plausibility of pregnant teenagers flying over international waters during their third trimester. No one asked Coogle

---

[9] Clercent was eventually acquitted by the Court after the People rested their case in chief.

whether a parent or guardian accompanied her. No one asked what airlines she flew on. In fact, no one asked what airport she flew out of. No one questioned Coogle about her physical appearance in 2001, whether, as a pregnant seventeen-year old, her pregnancy was visibly apparent or could have been hidden by baggy clothing, for example. What's more, the Court takes juridical notice the events at issue here occurred before the terrorist attacks of September 11th and the numerous changes to airline security that followed. The Court cannot just assume that Coogle lied when she testified under oath that she traveled back and forth between St. Croix and Miami.

¶36     To bolster his claim, Ventura points to several statements law enforcement officers took in the years after Williams's homicide. Ventura concludes that Coogle was lying in court because she signed off on several (if not all) statements law enforcement officers prepared from their interviews. Yet at trial, Coogle supposedly gave a different version of the events, Ventura claims. As one example, Coogle supposedly told law enforcement officers that she rode with Maximiliano Velasquez III—Coogle's boyfriend at the time and a co-defendant of Ventura who the jury acquitted— in a black pick-up truck to the location where Corporal Williams was murdered. At trial Coogle testified that she drove herself there in a maroon CRX after Velasquez called her. Another example: Coogle supposedly told law enforcement officers that crack cocaine was being cooked at the location of the homicide whereas at trial, she said she told the officers that she smelled an odor of crack cocaine. One final example: Coogle supposedly told law enforcement officers that her sister was also at the site of the homicide, yet during trial, said denied that her sister was there.

¶37     Ventura overlooks three things. First, Coogle acknowledged that the statements said what they said. She did not take issue with them. She simply disagreed with the memorialization of the law enforcement officers. Second, and more importantly, the core of Coogle's testimony did not change: Jose Ventura shot Williams in the hand and Jose Rivera shot him in the head. Finally, Coogle testified that she

had witnessed other crimes and the statements law enforcement took may not have been correct. (*See* Trial Tr. 61:14-16 (Jan. 29, 2014) ("I remember telling them that, but I think they were confusing the fact that it was due to another homicide that I witnessed.").)

¶38     This Court presided over the trial and was "uniquely situated to weigh the credibility of witnesses." *Ventura II*, 64 V.I. at 617 (citations omitted). The Court finds Coogle to be credible. She never lost her composure, raised her voice, or got combative while six attorneys, including the prosecutor, questioned her for three days straight, four including the suppression hearing. Her testimony did not faulter. Her story did not change. There were discrepancies between what she said at trial and what law enforcement officers wrote down, which Coogle addressed. She also admitted that she was traumatized by what she saw and took drugs and sought therapy to cope. The jury heard all this testimony—as well as claims that Coogle was "pursuing this fantastical story against Max Velasquez and his friends, and people that he knows, to get revenge for losing [her] daughter[,]" (Trial Tr. 53:10-13 (Jan. 30, 2014)—and still acquitted Maximiliano because Coogle testified that Ventura shot Williams in the mouth and Rivera shot him in the hand. No serious danger that innocent persons were convicted is present here. *See Percival*, 62 V.I. at 491

## CONCLUSION

¶39     Accordingly, for the reasons stated above, the People's surresponse will be reinstated and Ventura's motion for a new trial denied. An appropriate order follows.

**DONE** this **3**rd day of June, 2020.

**ATTEST:**
TAMARA CHARLES
Clerk of the Court

By: _____
Court Clerk
Dated: _____

**DARRYL DEAN DONOHUE, SR.**
**Senior Sitting Judge**

**SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

PEOPLE OF THE VIRGIN ISLANDS,    )    CASE NO. SX-12-CR-076
                       )
           Plaintiff,     )
                       )
         v.           )
                       )
JOSE VENTURA,         )
                       )
           Defendant.   )
                       )

## ORDER

**AND NOW**, for the reasons stated in the accompanying Memorandum Opinion of even date, it is hereby **ORDERED** that the Order dated April 4, 2014, entered April 10, 2014, is **VACATED** as to the portion striking The People's Reply to Defendant Jose Ventura's Reply Brief to the People's Response (2/28/14) to Defendant Ventura's Post-Verdict Motions Submitted Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure filed on March 12, 2014; the same is **REINSTATED**. It is further

**ORDERED** that the Post-Verdict Motions Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure Submitted Prior to Receipt of the Trial Transcript; Motion for Extension of Time to Supplement Post-Verdict Motions Upon Receipt of Transcript; and Reservation of Right to Supplement Upon Receipt of Transcript filed by Defendant Jose Ventura on February 21, 2014 is **DENIED** as to the request for a new trial and **DENIED** as moot as the request for an extension of time.

**DONE AND SO ORDERED** this **3rd** day of June, 2020.

                                     **DARRYL DEAN DONOHUE, SR.**

ATTEST:                               **Senior Sitting Judge**
TAMARA CHARLES
Clerk of the Court

By: _____

Dated: _____